UNITED STATES STEEL CORPORA-
TION, Plaintiff-Appellant,

v.

Russell E. TRAIN, Administrator, United
States Environmental Protection Agen-
cy; Francis T. Mayo, Regional Adminis-
trator, Region V, United States Environ-
mental Protection Agency; James O. Mc-
Donald, Director of Enforcement, Region
V, United States Environmental Protec-
tion Agency; and Marvin E. Jones, Ad-
ministrative Law Judge, United States
Environmental Protection Agency, De-
fendants-Appellees.

UNITED STATES STEEL CORPORA-
TION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

Nos. 76–1425, 76–1616.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1977.

Decided May 13, 1977.

Michael D. Freeborn, Dixie L. Laswell, James T. Harrington, Henry L. Pitts, Chicago, Ill., for petitioner.

Peter R. Taft, Asst. Atty. Gen., Raymond W. Mushal, Atty. Dept. of Justice, G. William Frick, E.P.A., Washington, D. C., David A. Ullrich, Atty., U.S. E.P.A., Chicago, Ill., Barry L. Malter, U. S. E.P.A., Christopher J. Dunsky, Washington, D. C., Samuel K. Skinner, U. S. Atty., Chicago, Ill., for respondent.

Joseph V. Karaganis, Chicago, Ill., Rollin E. Thompson, Deputy Atty. Gen., Indiana Stream Pollution Control Bd., Indianapolis, Ind., William R. Quinlan, Corp. Counsel, Chicago, Ill., for amicus curiae.

Alexander Polikoff, Douglass W. Cassel, Jr., Thomas D. Eisele, James D. Griffith, Chicago, Ill., for intervenors.

Before CUMMINGS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

TONE, Circuit Judge.

These consolidated cases bring before us an Environmental Protection Agency (EPA) order granting a discharge permit under the Federal Water Pollution Control Act Amendments of 1972 and a related District Court judgment. In No. 76–1616, United States Steel Corporation's petition for review of EPA's order granting a National Pollutant Discharge Elimination System (NPDES) permit for the company's Gary Works pursuant to § 402 of the Act, 33 U.S.C. § 1342, 86 Stat. 880,[1] the company challenges the conditions imposed by the permit. No. 76–1425 is an appeal from a District Court's dismissal of a complaint which the company filed while the administrative permit proceeding was still in progress, seeking review of the administrative law judge's refusal to consider certain issues in that proceeding.

I.

*The Statute* [2]

The cornerstone of the Act's scheme for cleaning up the nation's waters is § 301(a)'s prohibition against "the discharge of any pollutant by any person" except as specifically permitted by administrative action taken pursuant to specified sections of the Act. An existing source such as the Gary Works may obtain permission to discharge pollutants by applying for an NPDES per-

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Sections of the Act are referred to in this opinion by their designations in the Statutes at Large. The parallel United States Code citations for the sections to which most frequent reference is made are as follows:
 Section 301—33 U.S.C. § 1311
 Section 303—33 U.S.C. § 1313
 Section 402—33 U.S.C. § 1342
 Section 510—33 U.S.C. § 1370

2. The Act has been summarized and explained elsewhere. *E. g., E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 116–121, 97 S.Ct. 965, 969–971, 51 L.Ed.2d 204 (1977); *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 202–209, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *American Meat Institute v. EPA,* 526 F.2d 442, 444–446 (7th Cir. 1975). Our summary, therefore, will be limited to the provisions directly involved in these appeals.

mit under § 402.[3] EPA[4] administers the permit program in each state unless and until the state takes over that function, which Indiana did not do in time to process the Gary Works application. A permit, which is issued upon application and after opportunity for a public hearing, states the pollutants and amounts thereof that may be discharged at each of the plant's outfalls, and imposes conditions upon those discharges. A permit thus transforms "generally applicable effluent limitations and other standards—including those based on water quality—into obligations (including a timetable for compliance) of the individual discharger." *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).

■ The Act provides for two kinds of restrictions on the discharge of pollutants. First, federal, technology-based effluent limitations are to be established in two stages, one set to be met by July 1, 1977, and to be based upon "the best practicable control technology currently available" (which we sometimes refer to as "1977 technology" or "BPT"), and the other to be met by July 1, 1983, and to be based on "the best available technology economically achievable." Section 301(b). Second, the states are allowed to impose more stringent limitations, including water quality standards, treatment standards, or schedules of compliance. Sections 301(b)(1)(C) and 510. See also *EPA v. California ex rel. State*

*Water Resources Control Board, supra*, 426 U.S. at 219, 96 S.Ct. 2022. Congress thus has chosen not to preempt state regulation when the state has decided to force its industry to create new and more effective pollution-control technology.[5] These state limitations must also be met by July 1, 1977, § 301(b)(1)(C), and, like the federal limitations, are implemented by conditions which are included in NPDES permits.

In reviewing the U.S. Steel permit we are primarily concerned with the 1977 state and federal limitations. Except with respect to a final limitation on blast-furnace discharges, the additional federal limitations that become effective July 1, 1983 are not involved in this proceeding.

## II.

### The Facts and Prior Proceedings

*The Plant*

U.S. Steel's Gary Works occupies 3700 acres on the southern shore of Lake Michigan. An integrated steel mill, Gary Works produces coke, iron, steel, and primary and finished steel shapes. The plant draws water from Lake Michigan and each day discharges up to 775 million gallons of polluted water into the lake and into the Grand Calumet River, which flows into the lake. The discharges are made through five outfalls into the lake and 14 into the river.[6] Each day the 500 million gallons

---

3. As the Supreme Court observed in *EPA v. California ex rel. State Water Resources Control Board, supra*, 426 U.S. at 205, 96 S.Ct. at 2025, "Under NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms." To the extent that language in our earlier opinion in *Stream Pollution Control Board of Indiana v. U.S. Steel Corp.*, 512 F.2d 1036, 1042–1043 (7th Cir. 1975), may be read as inconsistent with this interpretation of the Act, it is of course no longer controlling.

4. The terms "EPA" and "the Administrator" are used interchangeably in this opinion.

5. Section 510 preserves in general terms the right of any state to impose limitations and standards more stringent than those adopted under the Act. Accordingly, state limitations

supersede less stringent 1983 federal limitations adopted pursuant to § 301(b)(2), even though that subsection does not contain a counterpart of § 301(b)(1)(C). As for new sources, compare § 306(d) with § 510.

6. One lake outfall (# 039) and six river outfalls (# # 002, 017, 020, 028, 030, and 034) discharge primarily "process waste water," which is defined in the Regulations, 40 C.F.R. § 401.11(q), as:

"any water which during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, by-product, or waste product."

The remaining 12 outfalls discharge "noncontact cooling water," which is defined in the Regulations, 40 C.F.R. § 401.11(n), as:

discharged into the river include an average of 180 pounds of phosphorus, 325 pounds of phenol, 3100 pounds of cyanide, 3400 pounds of flourides, 5100 pounds of ammonia, 82,000 pounds of chlorides, and 180,000 pounds of sulphates. These pollutants eventually flow into lower Lake Michigan.

### The EPA Permit Proceeding

U.S. Steel's initial application for a discharge permit for its Gary Works was made in 1971, before the adoption of the Federal Water Pollution Control Act Amendments of 1972. That application was submitted to the Army Corps of Engineers, which was charged with the responsibility of issuing permits under the Refuse Act.[7] The FWPCA transferred permit authority from the Corps of Engineers to the Administrator of EPA. As provided in § 402(a)(5) of that Act, U.S. Steel's application was treated as an NPDES permit application.

EPA initially issued a permit for the Gary Works in October 1974, after having published notice of its proposed action. The permit contained effluent limitations, monitoring requirements, and additional conditions, together with a compliance schedule. U.S. Steel did not accept the permit but requested an administrative hearing pursuant to EPA regulations, 40 C.F.R. § 125.36. In its request, the company proposed permit conditions which it contended satisfied the Act, some of which would have allowed it to increase the amount of pollutants in its discharges.

After the hearing and a limited remand ordered by EPA, the Regional Administrator substantially approved the conditions contained in the permit, which had been formulated by the Regional Enforcement Division. U.S. Steel appealed, pursuant to 40 C.F.R. § 125.36(n)(1), to the Administrator, who denied review. The permit was reissued by EPA on June 25, 1976, with a modified compliance schedule. U.S. Steel then filed its petition for review in this court.

### The Permit

The permit imposes technology-based limitations governing pH, total suspended solids (TSS), and oil and grease at each individual outfall.[8] These limitations are designed to reflect the level of pollutant discharges remaining despite installation of 1977, or best practicable, technology. Throughout the course of the permit proceeding, the parties have agreed that BPT is currently being used by U.S. Steel at all but one outfall. Therefore, the only dispute as to the technology-based limitations on those outfalls is whether the effluent limits established by EPA properly reflect BPT operations.

The one outfall that the parties do not agree on is the iron-making blast-furnace outfall, # 017, which is U.S. Steel's major process-water outfall and the largest single source of pollution at the plant. The permit limitations on TSS at that outfall can

"water used for cooling which does not come into direct contact with any raw material, intermediate product, waste product or finished product."

**7.** Section 13 of the River and Harbor Act of 1899, 33 U.S.C. § 407, commonly known as the Refuse Act, prohibits a manufacturing establishment from discharging refuse water into any navigable water or into any tributary that could wash the refuse into navigable water. The Secretary of the Army, however, was authorized to issue permits allowing such discharges "whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby." In light of this provision, U.S. Steel argued in *United States v. United States Steel Corp.*, 328 F.Supp. 354 (N.D.Ind.1970), *aff'd*, 482 F.2d 439 (7th Cir.), *cert. denied*, 414 U.S. 909, 94 S.Ct. 229, 38

L.Ed.2d 147 (1973), that the Refuse Act covered only discharges that obstructed navigation or anchorage. After the district court's adverse decision in that case, and presumably because of it, the company filed its 1971 application for a permit under the Refuse Act. In 1973 the Supreme Court held that the Refuse Act imposed "a flat ban on the unauthorized deposit of foreign substances into navigable waters, regardless of the effect on navigation." *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 671, 93 S.Ct. 1804, 1815, 36 L.Ed.2d 567 (1973).

**8.** The final limitations for one outfall, # 034, also cover zinc, chromium, and tin. U.S. Steel did not contest these limitations during the agency proceedings.

be met only by installing a blast-furnace recycling system, which EPA asserts, and U.S. Steel denies, is BPT.

Other permit limitations, imposed because they are required by Indiana regulations, govern six chemicals, *viz.,* ammonia, cyanide, phenol, chloride, sulphate, and fluoride. These limitations apply to the plant's river outfalls as a group and not to individual outfalls. There are also thermal limitations based on state water quality standards.

For all but the blast-furnace outfall, there are only "initial" limitations, which are effective until June 30, 1977, and "final" limitations, which apply from July 1, 1977 until the expiration of the permit on October 31, 1979. The initial limitations govern only pH, TSS, and oil and grease, except that at two outfalls, # 007 and # 017, ammonia, cyanide, and phenol are also covered. The final limitations govern temperature, pH, TSS, and oil and grease for all 19 outfalls and ammonia and other chemicals for the 14 river outfalls, including the blast-furnace outfall. For that outfall the permit also contains an intermediate step, "interim" limitations on total suspended solids, which are effective between July 1, 1977 and June 30, 1979, with the final limitations on TSS becoming effective July 1, 1979. Schedules of compliance are established to enforce these deadlines, and U.S. Steel is required to monitor its discharges in order to present proof of its compliance.

The permit also restricts U.S. Steel's discharges of acid wastes to a deep waste-injection well to their present level. The company is required to monitor these discharges also and to submit data relating to the deep well and the performance of treatability studies of the deep-well wastes.

*The Action in the District Court*

At the EPA administrative hearing, U.S. Steel attempted to challenge the validity and application of (1) the state water quality standards set out in Indiana regulations SPC 4R and SPC 7R–2; and (2) certain NPDES regulations contained in 40 C.F.R. part 125. The administrative law judge determined that he lacked jurisdiction to decide these matters and therefore refused to consider them at the hearing.

U.S. Steel then filed an action in the United States District Court for the Northern District of Illinois, seeking declaratory and injunctive relief with respect to the issues the administrative law judge had declined to hear. Basing jurisdiction on 28 U.S.C. §§ 1331, 2201, 2202 and the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.,* U.S. Steel asked for the following relief:

(1) An order requiring EPA to determine the validity and applicability of Indiana's water quality standards or, in the alternative, review of those issues by the District Court.

(2) An order requiring EPA to determine the validity of certain "substantive" NPDES regulations or, in the alternative, District Court review of those regulations.

(3) Review by the District Court of certain NPDES regulations pertaining to permit procedures.

U.S. Steel moved for a preliminary injunction to stay the administrative hearing pending the District Court's decision on the merits. Following denial of the motion, an appeal was taken to this court. An application for stay of the administrative proceeding was denied, and after the administrative hearing was completed the appeal was dismissed as moot.

Thereafter the District Court, on EPA's motion, dismissed the complaint as failing to state a claim on which relief could be granted. The court explained its decision in an unreported memorandum, pointing out the inappropriateness of judicial interruption of an ongoing administrative process in the absence of irreparable injury or plain deprivation of constitutional right, the availability of judicial review of the administrative process in accordance with a specific statutory provision, and the general policy of avoiding piecemeal judicial review. U.S. Steel appeals from that judgment of dismissal.

## III.

### Procedural Issues

There are several procedural issues to be considered in each appeal before reaching the validity of the permit conditions.

### A. The Petition for Review: No. 76–1616

#### (1) Applicability of Administrative Procedure Act

The FWPCA requires the Administrator to provide an "opportunity for public hearing" before issuing a permit, § 402(a)(1). The agency has issued regulations providing for public hearings, held at the discretion of the Regional Administrator, 40 C.F.R. § 125.34, and separate adjudicatory hearings, held at the request of "any interested person" if the Regional Administrator approves, 40 C.F.R. § 125.36. Only an adjudicatory hearing was held on the permit now before us.

The FWPCA does not prescribe the procedures to be followed by the agency at these hearings. The parties disagree as to the applicability of the Administrative Procedure Act.[9] EPA has submitted a supplemental brief arguing at length that the adjudication provisions of that Act do not apply and that the only constraint on the agency's procedure is the due process clause.[10] The argument is that these sections, 5 U.S.C. § 554, and also 5 U.S.C. §§ 556 and 557, both of which are triggered by § 554,[11] apply only to an "adjudication required by statute to be determined on the record after opportunity for agency hearing"; and § 402 of the FWPCA requires only "opportunity for public hearing" and does not contain the words "on the record."

The absence of the words "on the record" is not conclusive, however. See *Phillips Petroleum Co. v. FPC*, 475 F.2d 842, 851 (10th Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974). Section 509(b)(1) of the FWPCA subjects proceedings under specified sections of the Act to judicial review in a court of appeals. Of the enumerated sections, only § 307, providing for toxic and pretreatment effluent standards, contains the words "on the record." Section 307(a)(2). The presence of these words in one section and their absence from the others is outweighed, however, by other considerations. It seems improbable that Congress would have contemplated that judicial review of proceedings under all the other sections enumerated in § 509(b)(1) would be conducted without a written record. Also pertinent is the language chosen by Congress in § 509(c) making that subsection applicable to "any judicial proceeding" under § 509(b) in which the determination under review is "required to be made on the record after notice and opportunity for hearing." This would have been an unusual way of singling out § 307 from all the sections listed in § 509(b).[12] U.S. Steel thus seems to have the better of the argument when it contends that §§ 554, 556, and 557 of the APA are applicable to NPDES permit proceedings.

Sections 556 and 557 are applicable for another reason: § 558(c) of the APA provides, independently of § 554 of that Act, that "[w]hen application is made for a license required by law" the agency shall hold proceedings which shall be "conducted in accordance with sections 556 and 557." Because this is a license application proceeding, §§ 556 and 557 apply whether or

---

9. In *Porter County Chapter of the Izaak Walton League of America, Inc. v. Train*, 548 F.2d 1298 (7th Cir. 1977), this court assumed, without deciding, that the APA applies to NPDES permit-issuing proceedings.

10. In its brief in *American Meat Institute v. EPA, supra*, 526 F.2d at 442, EPA acknowledged the applicability of the APA to informal rule-making proceedings under the Federal Water Pollution Control Act Amendments.

11. Section 556 applies to hearings required by § 554, and § 557 to hearings required to be conducted in accordance with § 556.

12. *Cf. E. I. duPont de Nemours & Co. v. Train, supra*, 430 U.S. at 136, 97 S.Ct. at 979:

"[I]n other portions of § 509, Congress referred to specific subsections of the Act and presumably would have specifically mentioned § 301(c) if only action pursuant to that subsection were intended to be reviewable in the Court of Appeals."

not § 554 does.[13] In addition, § 706(2)(E) of the APA makes the case subject to the "substantial evidence" standard of judicial review.

The agency also argues that Congress must not have intended the APA to apply to NPDES permit proceedings under the FWPCA because the sheer number of those proceedings would make it impossible to observe the adjudicatory hearing requirements of the APA. On their face, §§ 556 and 557 apply to NPDES permit proceedings. We are not free to ignore the statutory words, which Congress has left unaltered, on grounds of expediency. And while the applicability of § 554 may not be as clear, the impossibility argument is not persuasive in any event. EPA has demonstrated in this case that in the relatively small percentage of cases in which applicants for NPDES permits demand hearings,[14] it is not unduly burdensome for the agency to conduct those hearings in compliance with the adjudication provisions of the APA.

### (2) Challenges to EPA Procedural Regulations

#### (a) Burden of Proof

■ U.S. Steel argues that the EPA regulation which puts the burden of proof on the applicant, 40 C.F.R. § 125.36(i)(1), violates 5 U.S.C. § 556(d), which requires "the proponent of a rule or order" to bear the burden of proof. The short answer to this contention is that U.S. Steel, as the applicant for a permit without which it would be forbidden by law to discharge pollutants, is the proponent. See *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1358 (4th Cir. 1976).

A related argument is that because the parties were required to submit their evidence simultaneously in writing prior to the hearing, U.S. Steel was "unable to properly prepare to respond to the Government's evidence." Inasmuch as U.S. Steel properly bore the burden of proof, it seems to us that, if anything, it benefited by this procedure. In any event, § 556(d) expressly provides "for the submission of all or part of the evidence in written form" when an agency is considering an application for an initial license, as it was here, and the company neither showed that it was denied the right to offer evidence in rebuttal nor pointed to any prejudice that it suffered.

#### (b) Failure To Require Hearing Officer To Make Initial Decision

■ U.S. Steel attacks the EPA regulation which requires the Regional Administrator rather than the hearing officer to render the initial decision. 40 C.F.R. § 125.-36(*l*)(1). This provision is said to violate 5 U.S.C. §§ 554(d) and 557(b). Section 554(d)(A), however, specifically exempts "applications for initial licenses" from the requirement that an agency employee who presides at the hearing make the recommended or initial decision. And § 557(b) states that the hearing officer shall decide the case "unless the agency requires, either

---

**13.** In resisting U.S. Steel's argument that the Administrative Procedure Act required the administrative law judge to make the initial decision, EPA argues halfheartedly that § 554(d)(A) applies and exempts initial license application proceedings from the requirement. Elsewhere it inconsistently argues that the "substantial evidence" standard of judicial review is not applicable despite § 706(2)(E), which makes that standard applicable to proceedings governed by §§ 556 and 557, as license application proceedings are. U.S. Steel, although it argues that the "substantial evidence" test is applicable for other reasons, elsewhere urges that the hearing officer should have made the initial decision, arguing that § 554(d)'s exemption for initial license application proceedings is inapplicable. See text at Part III, A(2)(b), *infra.* As we observed above, see *supra,* text at note

7, this appears to be U.S. Steel's first application for a discharge permit.

**14.** More than 42,000 dischargers have applied for permits, *E. I. duPont de Nemours & Co. v. Train, supra,* 430 U.S. at 132, 97 S.Ct. at 977, of whom about 2,000 have requested adjudicatory hearings. Gaines, *Decisionmaking Procedure at the Environmental Protection Agency,* 62 Iowa L.Rev. 839, 893, 894, 896 n. 287 (1977). If a substantial proportion of the applicants had elected to litigate, the entire permit program would have become hopelessly bogged down before the agency and the courts of appeals, regardless of whether the adjudication provisions of the APA apply.

in specific cases or by general rule, the entire record to be certified to it for decision." The challenged regulation is such a general rule and is thus authorized by the statute. Moreover, § 557(b)(1) specifically provides that, in "determining applications for initial licenses," the agency itself may issue a tentative decision.

### (c) *Considerations Outside the Record*

█ U.S. Steel asserts that the following EPA regulation violates 5 U.S.C. § 556(e): "The Administrator shall decide the matters under review on the basis of the record presented and any other consideration he deems relevant." [15]

Section 556(e) provides that the "transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision . . . ." While the regulation might have been more artfully worded, we believe it simply permits the Administrator to use his expertise in making decisions. We do not read it as authorizing him to base his decision on evidence outside the record. In any event, the Administrator did not state in this case that he was basing his decision to deny review on any matter outside the record, and we will not presume that he did so. *Cf.* 40 C.F.R. § 125.36(n)(9)(ii).

### (3) *Agency Refusal To Consider Validity of Procedural Regulations*

█ U.S. Steel complains that it should have been allowed, at the administrative hearing, to challenge the EPA procedural regulations governing the permit proceeding. EPA responds that the agency was not required to consider these questions, inasmuch as it had already indicated its view of the matter by adopting the regulations. We think U.S. Steel cannot complain, so long as the validity of the regulations is subject to review by this court.

We have already considered and rejected U.S. Steel's challenges to specific regulations. U.S. Steel also asserts that the regulations in their entirety "are unlawful in that said regulations were improperly pro-

mulgated without notice or opportunity for comment. 5 U.S.C. § 553; 'Notice of Proposed Rulemaking,' 30 Fed.Reg.No. 7, January 11, 1973." Without more, we are hardly in a position to evaluate this conclusory argument, to which EPA has not responded. Moreover, U.S. Steel's failure to show that it was prejudiced by the regulations makes further consideration of this argument unnecessary.

### (4) *Agency Refusal To Consider Validity of Indiana Water Quality Standards*

The administrative law judge held that he was without jurisdiction to consider the validity of the Indiana water quality standards upon which certain limitations in the permit were based, a position the Administrator sustained. U.S. Steel contends that Indiana provides no judicial review of the validity of the standards, and that due process therefore required the Administrator to determine the validity of those standards.

█ Under § 402(a)(1) of the FWPCA, the Administrator must condition the NPDES permit upon the discharger's meeting "all applicable requirements under sections 301," *et al.* Section 301(b)(1)(C) requires compliance by July 1, 1977 with

"any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 510) . . . ."

Section 510 preserves the right of any state to impose limitations more stringent than the federal limitations under the Act. Because the Administrator is required by the Act to include in the permit any more stringent state limitations, including those necessary to meet state water quality standards, and is given no authority to set aside or modify those limitations in a permit proceeding, he correctly ruled that he had no authority to consider challenges to the validity of the state water quality standards in such a proceeding.

---

**15.** 40 C.F.R. § 125.36(n)(12).

■ The Administrator's only authority to pass on state water quality standards is conferred by § 303 of the Act, which empowers him to determine whether the standard "meets" or is "consistent with the applicable requirements of this Act." In accordance with that provision he has, in a separate proceeding, considered and approved the applicable Indiana water quality standards. 40 C.F.R. § 120.10. Authority to approve or disapprove a state's identification of polluted waters and calculation of total maximum daily loads is conferred on the Administrator by § 303(d)(2). These determinations are reviewable in an action in the district court under the judicial review provisions of the APA. See note 18, *infra.*

Assuming that the state standards are consistent with the Act and are not reviewable in the state courts, as U.S. Steel contends they are not,[16] the only remaining possible challenge is a federal action against the state officers responsible for their enforcement alleging deprivation of a federal constitutional right. See Part III, B(1), *infra.*

■ U.S. Steel relies on *Consolidation Coal Co. v. EPA,* 537 F.2d 1236 (4th Cir. 1976), which held that when there was no available state procedure for obtaining a hearing on the appropriateness of a state-originated durational limit which was to be included in an NPDES permit pursuant to a § 401(d) certification, due process required that EPA hold such a hearing prior to taking any final administrative action.[17] To the extent that *Consolidation Coal* may be inconsistent with the views we have expressed, we decline to follow it.* As we have already noted, however, a hearing on the validity of the state standards under the United States Constitution would be available in an action against the state officers in the federal district court. That hearing may encompass the issue of whether the procedure by which the state adopted its regulations offended due process.

## (5) *Procedural and Evidentiary Rulings*

■ We cannot consider vague contentions that there were unspecified "individual errors in procedure which violated either the Administrative Procedure Act . . . or the . . . regulations . . . or both." U.S. Steel's complaint regarding the Regional Administrator's alleged "wholesale verbatim adoption of most of the Staff's proposed findings" is not enough to permit us to conclude that he did not independently review the evidence, nor is its charge that he "complete[ly] fail[ed] to acknowledge contrary evidence." Nor can we review unspecified "clearly erroneous findings of fact and conclusions of law, and the deprivation of Petitioner's right to due process of law." Equally vague is the allegation of

"a course of procedure wherein one party is held strictly accountable to the rules while its opponents are given great leeway and where procedural rules are waived for one side but strictly enforced for the other."

Similarly unspecific are the attacks upon the testimony of the agency's experts as containing opinions they "were either not qualified to give or which were without foundation," or as "unsworn in large part," hearsay, or "legal conclusions." Even apart from the wide latitude allowed an adminis-

---

16. The availability of a state remedy is in dispute. In the view we take of the case, it is unnecessary to resolve that dispute.

17. There the West Virginia Department of Natural Resources had certified the discharge permit for only two years, until July 1976, because of its concern that iron discharges from the company's mine might exceed the levels allowed by the applicable water quality standards and, after July 1, 1977, by § 301(b)(1)(C) of the FWPCA. The issue, accordingly, concerned only the duration of an NPDES permit, not one of the conditions or limitations upon the permittee's discharges. Compare 40 C.F.R. § 125.22 with 40 C.F.R. § 125.25.

* In view of what is arguably a conflict between our views and those of the Fourth Circuit in the *Consolidation Coal* case, the portions of this opinion relevant to our holding have been circulated among all judges of this court in regular active service. No judge favored a rehearing in banc with respect to that holding.

trative agency in the receipt of evidence, it is impossible for a court to consider general allegations such as these. Challenges to specific conditions of the permit are considered below.

### B. The Appeal from the District Court: No. 76–1425

The appeal from the judgment of the District Court dismissing U.S. Steel's action also raises a series of procedural questions, some of which are related to those presented in the petition for review. We deal with these questions in the order in which they are alleged in the three counts of the complaint.

### (1) Validity of Indiana Water Quality Standards (Count I)

U.S. Steel argues that the District Court should have required EPA to consider the constitutionality of the Indiana water quality standards. For the reasons stated above, the agency had no authority to consider the validity of those standards, and this relief was therefore properly denied by the District Court.

 Nor could the District Court have properly granted U.S. Steel's alternative request that the court itself review the validity of those standards under the United States Constitution. As we have seen, the standards are state, not federal, regulations, and the Administrator was required by the Act to include in the permit any discharge limitations necessary to meet them. While these state regulations, like any other state regulation or statute, can be challenged on federal constitutional grounds in a federal action against the appropriate state officials in a district in which jurisdiction and venue are proper, this was not such an action.

 The District Court in this case, however, did have authority to review the Administrator's approval, prior to the permit proceeding, of the Indiana water quali-

ty standards as consistent with the FWPCA.[18] EPA argues that the complaint did not seek this relief, and we agree. Apart from the mere conclusory assertion that the Indiana standards are contrary to the purposes and provisions of the FWPCA, the complaint did not allege any incompatibility between the state standards and the Act. This claim was therefore insufficient in law.

### (2) Validity of EPA Regulations (Counts II and III)

 Also properly dismissed was U.S. Steel's claim that the District Court should either have itself held invalid the NPDES substantive and procedural regulations, or ordered EPA to consider their validity in the permit proceeding. As we have already held, this court is the proper forum for challenging those regulations on review of EPA's permit order. We have considered the challenges asserted and found them to be without merit.

We therefore affirm the judgment of the District Court in No. 76–1425, dismissing U.S. Steel's complaint. We now return to the petition for review, No. 76–1616, and consider U.S. Steel's challenges to specific conditions of the permit.

### IV.

### Permit Conditions

### A. Limitations Required by State Law or Regulation

The limitations on the six chemicals, ammonia, cyanide, phenol, chloride, sulphate and fluoride, and the thermal limitations are, as we have seen, state limitations adopted by Indiana pursuant to its plenary power preserved by § 510. They were included in the permit because § 402(a)(1) required the Administrator to condition the discharge permit on compliance with "all applicable requirements" of, inter alia,

---

18. While the APA is not an independent source of jurisdiction, Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), 28 U.S.C. § 1331(a) confers jurisdiction over ac-

tions such as this without regard to the amount in controversy. See 430 U.S. at 105, 97 S.Ct. at 984. Cf. Bethlehem Steel Corp. v. EPA, 538 F.2d 513 (2d Cir. 1976).

§ 301, and § 301(b)(1)(C) requires dischargers to achieve, in addition to the technology-based effluent limitations determined by EPA, "any more stringent limitation, including those necessary to meet water quality standards . . . established pursuant to any State law or regulation (under authority preserved by Section 510) . . . ."

### (1) *Chemical Limitations*

The limitations for the six chemicals are aggregate weight limits on the total discharges that may be made from all the outfalls at which those chemicals are discharged, which are the river outfalls. The allowable discharges are not allocated among the individual outfalls.[19] Compliance, however, is determined by monitoring at each outfall.

◼ In challenging these limitations, U.S. Steel argues that the water quality standards on which certain limitations are based are invalid. As we have held in Parts III, A(4) and III, B(1), *supra,* however, those standards are not subject to review in either of the appeals presently before us. The company also argues that the limitations on the six chemicals are impossible to achieve with present technology. Even if this is true,[20] it does not follow that they

are invalid. It is clear from §§ 301 and 510 of the Act, and the legislative history, that the states are free to force technology.[21] Although the Indiana Board considered technology in setting some of these limitations, it was not required to do so. Only the federal effluent limitations must be technology-based, and they represent the minimum level of pollution reduction required by the Act. See *Leg. Hist.,* at 1468. If the states wish to achieve better water quality, they may, even at the cost of economic and social dislocations caused by plant closings. See *Leg. Hist.,* at 231, 1282. *Cf. Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). Thus we reject this argument as well.

U.S. Steel also asserts in conclusory terms that the limitations on the six chemicals are not based upon substantial evidence and are arbitrary. If this is intended as an argument that the allocations are more stringent than would be necessary to achieve the water quality standards, it fails for two reasons:

◼ First, notwithstanding EPA's over-generous concession to the contrary,[22] this necessity argument is not available in this proceeding. Section 301(b)(1)(C), the ultimate source of the Administrator's obligation to put the state limitations in the per-

---

**19.** The permit limitations are:

| | Daily Average (In lbs.) | Daily Maximum (In lbs.) |
|---|---|---|
| Ammonia | 2,150 | 4,300 |
| Cyanide | 109.5 | 219 |
| Phenol | 25.76 | 51.52 |
| Chloride | 40,023 | 80,046 |
| Fluoride | 2,778 | 5,556 |
| Sulphate | 95,660 | 191,320 |

These limitations are applied on a net basis.

**20.** EPA contends that there are several available technologies which, used alone or in combination, would probably enable U.S. Steel to comply with the waste load allocations. These include alkaline chlorination, activated carbon adsorption, incineration (*i. e.,* coke quenching or dry slag cooling), deep well injection, ferro-ferri cyanide removal, air or steam stripping, blowdown reductions, or discharge into an expanded Gary sewage treatment plant.

**21.** *See, e. g., Leg. Hist.,* at 145, 246, 353, 379, 524, 1232–1233, and 1461–1462. (All citations to the legislative history are to "A Legislative

History of the Water Pollution Control Act Amendments of 1972," prepared by the Environmental Policy Division of the Congressional Research Service of the Library of Congress (Comm. Print 1973).) Compare *Union Electric Co. v. EPA,* 427 U.S. 246, 263–268, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).

**22.** EPA's concession here and in the proceeding below, that U.S. Steel may challenge the waste load allocations as not "necessary to meet water quality standards," is apparently based on the opinion of its General Counsel that a § 401 certification is conclusive on the agency but a § 303(d) "Load Allocation Summary" is not, although the latter is "clearly entitled to weight in the Administrator's decision." *Decision of the General Counsel No. 27,* at 2 (Aug. 4, 1975). Compare, however, *Decision of the General Counsel No. 44,* at 5 (June 22, 1976), where the transcendent authority of § 301(b)(1)(C), even in the absence of certification, seems to be recognized.

mit, is not limited to restrictions based on water quality standards but extends to "any more stringent limitation" the state adopts pursuant to the authority preserved by § 510. As we read the Act, the Administrator had no more authority to inquire into whether the limitations adopted by the state were necessary to achieve the water quality standards than he did to inquire into the validity of those standards.

■ Second, even if a necessity argument could be entertained in this proceeding, U.S. Steel has presented its objections in such a general and conclusory way that we doubt such an argument was intended. Assertions that the limitations are "not based upon substantial evidence" and "not supported by accurate data and analysis and sound scientific principles," without elaboration or discussion of the information in the record which is pertinent to each limitation, cannot be considered.[23] Ours is an adversary, not an inquisitorial, system. Neither time nor expertise is available to us for searching a voluminous record for error in response to such general assertions as these. The fact that the entire record has not even been brought before us,[24] and we therefore could not exclude the possibility of record support for a given limitation in data which were not made available, leads us to believe that these arguments were included in the brief as rhetoric rather than as a serious challenge to the record support for each limitation.[25]

We accordingly overrule the objections to the limitations on the six chemicals.

### (2) Thermal Limitations

The permit also establishes limitations, effective July 1, 1977, on the temperature of the adjacent receiving waters of Lake Michigan and the Grand Calumet River after admixture of the discharges.[26] Monitoring requirements of the permit enable EPA to measure U.S. Steel's compliance with the thermal limitations. The limits are taken directly from the Indiana water quality standards applicable to the two bodies of water. The permit offers U.S. Steel an alternative to compliance with these limitations as authorized by § 316(a) of the Act. Under that section, the company may attempt to

> "demonstrate to the satisfaction of the Administrator . . . that [the] effluent limitation[s] proposed for the control of the thermal component of [its] discharge . . . [are] more stringent than necessary to assure the projection [sic] and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on [Lake Michigan and/or the Grand Calumet River]."

If the company's showing is successful, EPA may set less stringent thermal limitations, provided they still meet the aquatic-life requirements. U.S. Steel challenges both the thermal limitations and the thermal demonstration provisions of the permit.

---

23. This appears under the heading, "It is Impossible to Comply with the Discharge Limitations for Ammonia, Phenol, Cyanide, Chloride, Sulfate and Fluoride." If petitioner's conclusory assertion in its reply brief that "the limitations for chloride, sulfate and fluoride were based on an erroneous interpretation of the Combinatorics study" was meant to raise this issue specifically, it came too late. *American Meat Inst. v. EPA, supra,* 526 F.2d at 462 n. 44.

24. Instead of the full record, EPA filed a certified list as provided in Circuit Rule 16(b). That rule gave U.S. Steel the right, which it did not exercise, to have the whole record sent up. The appendixes contain only limited excerpts from the record.

25. In view of EPA's concession, however, and the fact that this is our first opportunity to review an NPDES permit, we have examined those parts of the record before us that bear on the necessity issue. That examination is briefly reported in an unpublished order filed simultaneously with this opinion.

26. The limitations are different for the lake and the river, varying seasonally for each body of water. Discharges into the Grand Calumet River may not cause waters adjacent to the discharge to exceed 60°F from October through March, or 90°F during the six spring and summer months. Comparable limitations for the lake are the lower of existing temperature plus 3°F or 45°F during January-March, 50°F in December, 55°F in April, 60°F during May and November, 65°F in October, 70°F in June, and 80°F during July-September.

U.S. Steel argues that "the thermal limitations in this permit are vague, arbitrary and unreasonable." As effluent limitations based directly on state water quality standards [27] and included in the permit pursuant to § 301(b)(1)(C), however, the thermal limitations are not open to substantive challenge in this proceeding. The company's related claim that compliance with the limits cannot be reliably determined must be rejected insofar as it is an objection to the permit's use of temperature as the measurement scale for determining compliance with thermal water quality standards.[28] We know of no alternative measurement scale. And, although thermal monitoring is necessarily imprecise, it is possible to determine whether a discharger is in substantial compliance with thermal effluent limitations. The thermal limitations in the permit are therefore upheld.[29]

U.S. Steel also objects to the "thermal discharge demonstration" provision of the permit, included pursuant to § 316(a), which offers the company an opportunity to demonstrate that the thermal limitations imposed by the permit are more stringent than necessary to protect aquatic life. First, U.S. Steel argues that it is unfair to make such a demonstration "the sole method by which a permittee can obtain relief from improper thermal limitations, [especially] . . . where the permittee is attacking the validity of the thermal limitations themselves." We have held, however, that U.S. Steel cannot challenge the validity of the thermal limitations in this proceeding. The fairness argument must be addressed to the Congress, not this court.

Second, the company argues that the permit improperly applied § 316(a) and its implementing regulations, 40 C.F.R. part 122. See *Appalachian Power Co. v. Train, supra,* 545 F.2d at 1371–1372. The argument that the Grand Calumet River would not exist, much less contain a balanced aquatic life, without U.S. Steel's discharges from Gary Works goes to the validity of the thermal limitations themselves, and is therefore not available in this proceeding. The argument that the study requirements are too vague to enable the company to comply with them does not persuade us. Accordingly, the thermal discharge demonstration provision is upheld.[30]

27. U.S. Steel argues that these limitations are water quality standards and not effluent limitations. This semantic argument is without merit. Inasmuch as "heat" is defined as a pollutant in § 502(6) of the Act, § 301(a) renders any "discharge" of heat unlawful unless performed in compliance with the Act. It is clear from § 303(d)(1)(B) that Congress thought it had enacted "controls on thermal discharges" under § 301(b). The term "effluent limitations," defined in § 502(11) of the Act, therefore includes restrictions on discharges of heat or, as § 316(a) itself expresses it, "control[s] of the thermal component of any discharge." The regulations note that limitations on heat are "not appropriately expressed by weight," 40 C.F.R. § 124.43, but they must be expressed in some fashion. Because of the convenience of temperature limits, thermal water quality standards do not need to be "translated" in order to become applicable to an individual discharger as effluent limitations. See the review of the Act authored by EPA's former General Counsel, R. Zener, "The Federal Law of Water Pollution Control," *Federal Environmental Law* 682, 693 (E. Dolgin and T. Guilbert, ed. 1974).

*Bethlehem Steel Corp. v. EPA,* 538 F.2d 513 (2d Cir. 1976), is not contrary. The court there simply held that not all "water quality standards" are "effluent limitations," and that it

therefore lacked jurisdiction under § 509 of the Act to review EPA's approval of New York State's revised water quality standards. Nothing in that opinion implies that water quality standards cannot become effluent limitations, once they are applied to an individual discharger by inclusion in an NPDES permit.

28. The company also argues that the unreliability of temperature limitations makes it inappropriate to levy criminal sanctions for violations of this part of the permit. Inasmuch as there are no criminal sanctions before us, we have no occasion to decide that issue.

29. In view of our ruling that U.S. Steel's substantive claims regarding the thermal limitations cannot be presented in this proceeding, the company suffered no prejudice from the Administrator's ruling that it had waived its right to an adjudicatory hearing on the propriety of the thermal limitations by failing to propose its own alternative thermal limitations.

30. In its reply brief U.S. Steel objects to requiring this demonstration before the validity of the thermal limitations is determined, pointing out that Congress apparently contemplated that the thermal discharge demonstration would be

## B. Technology-Based Effluent Limitations

### (1) At All Outfalls Except # 017

U.S. Steel attacks all the effluent limitations indiscriminately as arbitrary and unsupported by substantial evidence. Its broadside argument, if read literally, is that no limitation for any outfall is supported by substantial evidence and all are arbitrary. It should first be noted that an examination of the Regional Administrator's decision shows that U.S. Steel did not object before the agency to many of the limitations. Moreover, U.S. Steel's brief does not particularize its claim with respect to any outfall or limitation. As we said in considering the challenge to the limitations on discharges of the six chemicals, a court will not, in response to such a general assertion of error, sift a vast administrative record, only a portion of which has even been brought before it by the parties, for evidence arguably bearing on each limitation. In view of U.S. Steel's failure to particularize, it is not surprising that EPA's brief does not address itself to individual limitations. This means, however, that we have no guidance from either side in analyzing the evidence relating to particular limitations.

We would forfeit the benefits of the adversary system if we undertook the independent and unassisted search for error which would be necessary to determine the accuracy of U.S. Steel's general assertion of arbitrariness and lack of record support. This court will consider a challenge to an effluent limitation in an NPDES permit only if our attention is directed by the petitioner's brief to the specific limitation and the alleged deficiencies in the supporting evidence or reasoning of the agency.[31]

### (a) Statistical Analysis

As we noted above, EPA and U.S. Steel agree that BPT is currently in place at all outfalls but # 017 (which is discussed separately below). The company argues that technology-based limitations on those outfalls should be no more stringent than past operating levels, but EPA contends that in certain instances past operations do not reflect the careful and efficient operations required under the NPDES permit program. The past operating levels are reflected in the monitoring data included in the monthly reports submitted by U.S. Steel to the Indiana Stream Pollution Control Board from 1973 to 1975.[32] EPA's engineers used these data in calculating the permit limitations, but they disregarded extremely high discharge values they considered unrepresentative of proper plant or treatment-facility operations. U.S. Steel argues that this method was in error. Its proposed limitations were based on a statistical analysis of all the monitoring data, including the aberrations, and were computed so as to predict with a specified degree of accuracy, such as 95 percent, that no more than a given percentage of samples, such as 5 percent, would exceed the limitations.

---

made prior to the issuance of an NPDES permit. See *Leg. Hist.*, at 263–264. Despite the lateness of this claim, we observe that, in effect, U.S. Steel was given this opportunity, inasmuch as the original permit required the company to make its showing before the thermal limitations become effective on July 1, 1977.

31. Although we conclude we were not required to do so, we have in this, our first, permit review, examined those limitations to which U.S. Steel objected before the Regional Administrator, in the light of the Regional Administrator's decision and the other parts of the record that the appendixes have brought before us. Our conclusion from this examination is that the technology-based permit limitations are on the whole amply supported by the evidence and

are a reasonable exercise of the Administrator's authority under the Act. A summary of the analysis on which this conclusion is based appears in the unpublished order filed with this opinion.

32. Nearly 500 samples were taken from each of two process-water outfalls and over 200 from each of two others. At each of the other 15 outfalls approximately 100 samples were taken. The measurements taken at these outfalls were used to calculate two different values: a daily average (computed by dividing the total discharge by weight in a month by the number of days that month on which measurements were taken) and a daily maximum (the total discharge by weight in any one calendar day).

■ U.S. Steel points out that EPA discarded the high values without actual knowledge of their causes, although EPA witness Spyropoulos, a former design engineer for U.S. Steel who participated in EPA's development of the effluent limitations, testified to a number of possible causes. He and the other EPA witnesses agreed with U.S. Steel that statistical analysis was one appropriate method for computing effluent limitations, and so do we. We also agree with EPA, however, that it is entitled to use its expertise in pollution-control technology in judging the reliability or representative quality of particular data. See *American Meat Institute v. EPA,* 526 F.2d 442, 457 (7th Cir. 1975); *FMC Corp. v. Train,* 539 F.2d 973, 986 (4th Cir. 1976). Although EPA did not determine the specific cause of particular high values, our review of all the monitoring data persuades us that its decision to exclude those values as aberrations was a permissible one. As EPA exhibits demonstrate, the Gary Works regularly operated at discharge levels well below those indicated by the excluded values during the 29-month monitoring period. The range among the values used in EPA's calculations illustrates the operating flexibility available to U.S. Steel under the EPA method.

There are two additional reasons for rejecting the U. S. Steel proposal. First, we agree with the testimony of the EPA witnesses that one of the goals of the NPDES permit program is to insure that pollution-control facilities are operated as efficiently and carefully as possible. The U. S. Steel proposal, with effluent limitations derived from data taken before the permit was issued, may build in a factor for human or mechanical lapses that should not be tolerated.

■ Second, the limits proposed by U. S. Steel would, as EPA observes in its brief, actually allow an increase in the discharge of pollutants from Gary Works.[33] U. S.

Steel attempts to justify this result by showing that its proposal was consistent with EPA's own guidelines for the steel industry. The company derived its proposed daily maximum limits by multiplying the daily average limits by three, in accord with those guidelines. See 40 C.F.R. part 420 and 39 Fed. Reg. 24118 (change # 6) (June 28, 1974). It failed however, to demonstrate that EPA intended the factor of three as anything but a rough approximation of the daily fluctuations likely to occur in the steel-manufacturing process. Where, as here, the performance data show the plant to be capable of operating on a regular basis within a relatively narrow range far below the arbitrary multiplier of the guidelines, EPA may use the power granted it by § 402(a)(1) of the Act to set limitations lower than those that would result from use of the arbitrary multiplier. See *Leg. Hist.,* at 170, 176, 1468. To do otherwise would be to authorize an increase in the pollutants discharged by the plant, a result Congress certainly did not intend. See note 44, *infra.*

### (b) *Surface-Runoff Effects*

U. S. Steel next argues that, if the more lenient effluent limitations it proposes are not accepted, then at least monitoring samples taken during periods of surface runoff resulting from rainfall or melting snow should be disregarded in determining compliance with the NPDES permit.

As is demonstrated by the testimony of EPA witness McDermott, also an EPA engineer formerly employed by U. S. Steel, the agency considered surface-runoff effects in developing the effluent limitations for Gary Works. EPA's analysis revealed that the surface runoff from a day-long storm of .4 inches per hour, over the entire drainage area of Gary Works, would comprise only slightly over 10 percent of the plant's total water discharges for that day. The process-water portion of this total vol-

**33.** They would also allow discharges on a regular basis far in excess of those that have been normal in the past, even though EPA has not acknowledged the inevitability of such "excursions" or computed the likelihood or frequency of their occurrence at Gary Works. Compare *FMC Corp. v. Train,* 539 F.2d 973, 985–986 (4th Cir. 1976). Nor has U. S. Steel made a showing as to a reasonable "excursion" frequency, if any, at Gary Works.

ume would be treated.[34] The portion of the runoff that found its way into the 12 primarily cooling-water outfalls would have little or no ground contact because of the roof drains or, in the case of the runoff from the yard and road drains, would be taken to a sewer for treatment. And, if surface runoff did increase the concentration of total suspended solids in the cooling-water discharges, it would presumably increase those concentrations in the intake as well. The permit provision allowing U. S. Steel to calculate TSS levels on a net basis thus obviates to a great extent the need for a special surface-runoff exception.

Finally, we note that U. S. Steel itself offered no proof of the extent of this supposed surface-runoff effect on the Gary Works. The rainfall data that were presented were based on conditions at Midway Airport in Chicago, and even this information was not correlated with particular high discharge values revealed by the data from the 29 months of monitoring. Thus we are unable to determine what effect surface runoffs have had on the discharge levels or the treatment facilities at the Gary Works.

■ Accordingly, EPA was not required to accept U. S. Steel's contention that exemptions should be granted for surface runoffs.

### (2) *Outfall # 017*

#### (a) *BPT and Variance*

Before the issuance of the October 1974 permit in this case, EPA promulgated single-number effluent guidelines and limitations for the iron and steel manufacturing point-source category. 39 Fed. Reg. 24114 (June 28, 1974); 40 C.F.R. part 420.[35] In U. S. Steel's permit the TSS limitations for

outfall # 017, which serves the iron-making blast furnaces, were calculated from these limitations, 40 C.F.R. § 420.42, which, as is apparent from the Development Document, were based on EPA's conclusion that recycling constituted BPT for iron-making blast furnaces. *Cf. E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 122, 132 n. 23, 97 S.Ct. 965, 972, 977 n. 23, 51 L.Ed.2d 204 (1977).

In *American Iron & Steel Institute v. EPA,* 526 F.2d 1027 (3d Cir. 1975) (*AISI (I)*), the steel industry challenged various aspects of the regulations, but did not attack the 1977 TSS limitations based on the conclusion that recycling was BPT. The Third Circuit, while remanding the 1977 regulations, explicitly upheld the new-source and 1983 limitations on TSS discharges from iron-making blast furnaces, thereby approving recycling-based limitations twice as stringent as the 1977 limitations. The court's remand was based in large part on its conclusion that § 301 limitations must specify a range of effluent reductions attainable through the application of BPT rather than single numbers. Apart from the fact that the Supreme Court's approval of single-number effluent limitations in *duPont* renders this conclusion questionable, even the Third Circuit's remand dealt only with the agency's § 304(b)(1)(A) calculation of the "degree of effluent reduction attainable" by installing blast-furnace recycling; the underlying § 304(b)(1)(B) determination that recycling constitutes BPT remained unaffected. Thus, whether or not the entire iron and steel guidelines and limitations are resurrected by the *duPont* decision, the treatment in *AISI (I)* of the TSS limitations for iron-making blast furnaces leaves unimpeached EPA's conclusion that recycling is BPT.

---

**34.** As McDermott testified, although the "first flush" from a major rainfall adversely affects the performance of the pressure filters by sharply increasing the volume of water passing through them, the lagoons and clarifiers, which retain water for a greater length of time, are essentially unaffected by such a storm.

**35.** Although Congress contemplated that EPA would first issue § 304 guidelines and then follow with § 301 effluent limitations, time pressures forced the agency to combine the two stages. See *duPont v. Train, supra,* 430 U.S. at 122–125, 97 S.Ct. at 972–973. In this case the Phase I Iron and Steel Guidelines for the Blast Furnace (Iron) Subcategory, 40 C.F.R. § 420.40, *et seq.,* subpart D of part 420, represent EPA's § 304(b) BPT determinations and its § 301 effluent limitations.

Nevertheless, following that decision, the EPA Regional Administrator ordered a limited remand of the instant permit proceeding, in order to develop "further data on the best practicable engineering judgment as to what constitutes bpt" for the iron-making blast furnaces at Gary Works. After the remand, new TSS limits were developed for outfall # 017 based on EPA's determination that a blast-furnace recycling system constitutes the "best practicable control technology currently available" for that phase of the iron-making process, § 304(b)(1)(B).

U. S. Steel challenges EPA's determination that blast-furnace recycling constitutes BPT for the iron-making process at the Gary Works on three grounds: (1) EPA failed to consider the six factors set forth in § 304(b)(1)(B) as "relating to the assessment of [BPT]," and therefore the agency's designation of recycling as BPT was improper. (2) Installation of a recycling system would cause violations of the sulphate limits in the permit, and therefore recycling is not a "practicable" technology for Gary Works. (3) A recycling system cannot be built and placed in operation at Gary Works before July 1, 1977, and therefore is not "currently available" to U. S. Steel.[36]

■■■■ To begin with, we believe it was unnecessary for EPA to reexamine the BPT question following the remand in *AISI (I)*. As *duPont* makes clear, technology-based § 301 effluent limitations and § 304 guidelines, and necessarily the BPT on which they are based, are uniform national standards and are not to vary from plant to plant. *duPont v. Train, supra,* 430 U.S. at 127, 130–132, 136–137, 97 S.Ct. at 974, 976, 979; see also *AISI v. EPA, supra,* 526 F.2d at 1043. When no limitations or guidelines are yet available, NPDES permits are to be issued under § 402(a)(1) upon "such conditions as the Administrator determines are necessary to carry out the provisions of this Act." See *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692, 709–710 (1975). We believe that under these circumstances the BPT to be ascertained by EPA is still a uniform national standard for the class or category of plants of which the plant in question is a member. Therefore, even if the applicable BPT had not already been determined, the appropriate inquiry for EPA would have been, not what constituted BPT for the Gary Works, but what constituted BPT for the category and class of point sources of which the Gary Works was a member. In fact, however, EPA had already determined BPT for iron-making blast furnaces in developing the limitations which were remanded in *AISI (I)*. This BPT determination, and the nationally uniform TSS limitations based thereon, unimpeached, as we have seen, by the *AISI (I)* remand, constitutes a proper basis for establishing the TSS limitations in the permit for the Gary Works. It was unnecessary for EPA to consider the § 304(b)(1)(B) factors anew in this proceeding or otherwise reexamine the BPT issue.

■■■■ The proper inquiry for EPA, in establishing the permit limitations in this proceeding, was whether the circumstances of the individual plant warranted a variance from the nationally uniform limitations. Although the Act itself provides for individual source variances only from the 1983 limitations,[37] the Supreme Court's opinion in *duPont v. Train, supra,* 430 U.S. at 127–128, 97 S.Ct. at 975, infers variance authority in EPA with respect to the 1977 limitations as well. EPA has regularly included variance

---

**36.** U. S. Steel also complains that it was improper to issue the NPDES permit without holding a hearing pursuant to § 302. That claim, however, is premised on its belief that blast-furnace recycling is not BPT. In view of our conclusion below that it is, we need not address U. S. Steel's claim for a § 302 hearing. Perforce neither do we consider EPA's response that, whatever our ruling on recycling, § 302 is only triggered if limitations more stringent than those required under the § 302(b)(2) directive that the "best available technology economically achievable" be in place by July 1, 1983 are to be applied in order to attain "a balanced population" of aquatic life. See § 302(c).

**37.** As the Fourth Circuit noted in its opinion in the *duPont* case, 541 F.2d 1018 at 1028.

provisions, allowing different effluent limitations if "fundamentally different" factors are shown, in its regulations containing 1977 limitations, and it did so in the iron and steel regulations remanded in *AISI (I)*.[38]

The agency's reexamination of the BPT issue as if it were obligated to determine BPT for the Gary Works individually was the equivalent of determining whether there were fundamentally different factors at that plant which made BPT impracticable there and thus justified a variance from nationally applicable limitations based on BPT. From EPA's conclusion that recycling was "BPT for the Gary Works" it follows that the plant was not entitled to a variance. We now examine the facts and reasoning underlying that conclusion.

In both the initial hearing and the hearing on remand EPA considered the Development Document and other information it had used in formulating the guidelines and limitations for the iron and steel industry.[39] At the hearing on remand two EPA employees, James McDermott and Peter Spyropoulos, testified concerning the applicability of recycling technology to the Gary Works. The record demonstrates that EPA analyzed the § 304(b) factors with respect to the Gary Works specifically, as well as with respect to the steel industry in general. Furthermore, substantial evidence supports EPA's designation of blast-furnace recycling as BPT for the iron-making process in the steel industry generally and the reasonableness of imposing limitations on the Gary Works based on that BPT.

It is undisputed that recycling significantly reduces TSS levels in water discharged from iron-making blast furnaces. Moreover, as McDermott testified, the reduction in water flow achieved by the recycling system also increases the concentration of other pollutants, thereby rendering them susceptible to treatment or disposal which would otherwise be impossible or uneconomic.[40]

The Development Document notes that although a "majority of the [steel] plants around the country are operating on a once-through basis," recycling is employed as a water conservation device "in many plants." Spyropoulos testified that he helped design a recycling system similar to the one EPA proposes here; that system was installed at U. S. Steel's own South Works Plant in South Chicago by December 1970. Blast-furnace recycling is already in place at nearly all the iron-making facilities in the Chicago area; it is, as noted in the Development Document, "a well-established art."[41]

Both McDermott and Spyropoulos testified that blast-furnace recycling could be installed at the Gary Works. Their testimony was based on an inspection of the plant, a survey of four different steel plants

---

**38.** See, *e. g.*, 40 C.F.R. § 420.42. Persons other than the discharger could also seek a variance, and the limitations in an NPDES permit could be either more or less stringent than those in the guidelines. *Cf. Natural Resources Defense Council, Inc. v. EPA*, 537 F.2d 642 (2d Cir. 1976).

**39.** The Third Circuit reviewed these materials in some detail in its *AISI (I)* decision. See particularly 526 F.2d at 1047–1055.

**40.** Recycling itself also reduces the level of certain pollutants in the waste water. The Development Document notes that a "loss of phenol is inherent in the operation of a recycle system," apparently due to the lowered water temperature in the cooling tower. EPA witness Dr. Bramer also observed that, unless the pH is allowed to rise above 8, some loss of cyanide may also occur in the cooling tower. Documents filed with U. S. Steel's renewed stay request also support this point. Indeed, the guidelines set effluent limitations for ammonia, cyanide, and phenol attainable simply by installing blast-furnace recycling. The fallout of these chemicals may, however, result in the build-up of solids, or scaling, in the cooling tower, thereby reducing the efficiency of the recycling system itself.

**41.** Spyropoulos also testified that recycling systems are presently in operation at the Inland and Interlake Steel plants in Chicago, and, apparently, are on order for the Republic Steel plant in Canton, Ohio, and the Wheeling-Pittsburgh Steel plant at Steubenville North, Ohio. The State of Illinois, in a brief as *amicus curiae*, points out that, in addition to these plants, recycling is in use at U. S. Steel's own Waukegan Works, and at Republic Steel's South Chicago Mill and Youngstown Sheet & Tube Company's East Chicago Mill.

employing blast-furnace recycling, and discussions with manufacturers, contractors, and others. They also testified regarding the pollution-control facilities now in place at Gary Works, the new facilities and equipment needed for a recycling system there, and the costs and time required to construct and operate such a system.[42]

EPA could reasonably conclude that, despite the age of the iron-making blast furnaces at Gary Works, retrofitting would be feasible. Recycling has been installed at U. S. Steel's older South Works Plant and other existing iron-making blast furnaces. Because it is a part of the post-process treatment, it does not require changes in the manufacturing process itself. EPA's conclusions demonstrate that a variance based on infeasibility of recycling for the Gary Works was not justified. Compare *AISI v. EPA, supra,* 526 F.2d at 1048.

We also reject U. S. Steel's argument that the TSS limitations based on recycling as BPT are improper because recycling would result in violations of other limitations in the permit, specifically those governing discharges of sulphate. This argument is based on the fact that the acidity-alkalinity control unit, which would be included in the proposed recycling system to minimize scaling, would use sulphuric acid to lower pH. See note 40, *supra.* This would increase discharges of sulphates

above the levels allowed by the sulphate limitations of the permit.[43] U. S. Steel asserts that no technology is known that will enable it to solve this problem, and that therefore either the sulphate limits or the TSS limits must give way.

The sulphate limits were based on the Indiana waste load allocations, and were included in the permit pursuant to § 301(b)(1)(C). Although these limits restrict U. S. Steel to its present discharges, and may be below the level necessary to maintain water quality in U. S. Steel's segments of the stream, they are the waste load allocations adopted by the Indiana Stream Pollution Control Board and approved by EPA, under § 303(d) of the Act. Thus the sulphate limits are not subject to challenge in this proceeding,[44] and must be accepted by EPA and this court.

The sulphate limitations cannot be said to make recycling "impracticable" at Gary Works, and therefore not BPT under § 301(b)(1)(A) or § 304(b). As we observed above, the latter section provides for a determination of BPT which will be the basis for guidelines and effluent limitations that will be uniform throughout the nation. *duPont v. Train, supra,* 430 U.S. at 129, 97 S.Ct. at 975. See also *Leg. Hist.,* at 156, 162, 170. BPT, being nationally applicable, cannot be affected by the circumstances at a single plant. The real question, there-

**42.** TSS discharges can be reduced by up to 95 percent through the use of recycling. Under the permit, TSS discharges from the Gary Works would be reduced from the present 29,000 to 1,688 pounds per day, or just over 94 percent. This reduction would be achieved at a capital cost of roughly $8.6 million, less than 3.5 percent of the $246 million capital replacement cost of the Gary Works facility. The operating cost of the system would be about $6,000 a day.

**43.** The extent of this increase is not clear from the record. At oral argument counsel for U. S. Steel stated that recycling would generate only 200 additional pounds of sulphate each day. Unless counsel misspoke, this issue appears trivial, inasmuch as this figure is less than one quarter of one percent of the daily average limitation on sulphate discharges from the plant. In view of the vigor with which the company has pressed this argument, we assume that larger sulphate discharges are involved and treat the argument on its merits.

**44.** Even if they were, the 1972 Amendments to the FWPCA were not intended to allow an increase in the level of pollutants discharged. See, *e. g.,* the language in § 303(c)(2), stating that one of the purposes of revised water quality standards is to "enhance the quality of water," and 40 C.F.R. § 130.17, regarding the emphasis upon nondegradation of existing water quality. See also Hines, *A Decade of Nondegradation Policy in Congress and the Courts: The Erratic Pursuit of Clean Air and Clean Water,* 62 Iowa L. Rev. 643 (1977). *Cf. Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 540 F.2d 1114 (1976), *cert. granted, sub. nom. Montana Power Co. v. EPA,* —— U.S. ——, 97 S.Ct. 1597, 51 L.Ed.2d 802 (1977), and *City of Highland Park v. Train,* 519 F.2d 681 (7th Cir. 1975), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976).

fore, is whether the stricter Indiana standards justify a variance.

We believe they do not. The existence of state waste load allocations requiring limitations more stringent than the federal, technology-based limitations should not create a loophole through which compliance with the federal limitations may be evaded. Section 301(b)(1)(C) can hardly have been intended to authorize a state, by imposing limitations incompatible with BPT, to allow its industries to escape their duty to comply with nationally uniform federal limitations. An important reason for Congress' adoption of nationally applicable federal effluent limitations was to prevent individual states from attracting industry by adopting permissive water quality standards. See, e. g., *Leg. Hist.*, at 156, 263, 574–575. Surely Congress never intended those federal limitations to be relaxed because a state adopted water quality standards and waste load allocations requiring more stringent pollution controls. See *Leg. Hist.*, at 1461, 1468. Indeed, § 301(b)(1) provides that BPT-attainable effluent limitations "and . . . any more stringent limitation . . . established pursuant to State law or regulations" must be achieved by July 1, 1977.

■ Thus, we hold that the existence of more stringent state limitations is not one of the "factors" to be considered in determining whether an individual point source is entitled to a variance from a limitation based on BPT. This makes it unnecessary to consider EPA's alternative argument that there presently exists technology capable of achieving both the TSS and the sulphate limitations. See note 20, *supra.*

■ U. S. Steel challenges the limitations based on blast-furnace recycling on the additional ground that it cannot construct and place into operation a recycling system by July 1, 1977.[45] This contention must also be rejected. There was time to

install a recycling system between October 31, 1974, when the permit was first issued, and July 1, 1977, according to the testimony of Spyropoulos. The Supreme Court has held, in construing the Clean Air Act, that "litigation . . . [seeking a variance from national standards] . . . is carried out on the polluter's time, not the public's . . . ." *Train v. Natural Resources Defense Council*, 421 U.S. 60, 92, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975). There is no reason not to apply that principle here.[46] Therefore U. S. Steel cannot use the delay between October 1974 and the present as an excuse for not installing a recycling system.

■ This conclusion is further supported by Congress' intent that BPT be determined on a nationwide basis, with substantially the same technology-based effluent limitations applicable to all similar point sources. Temporal feasibility of BPT installation is not included in the § 304(b) factors and should not be a ground for a variance. Consideration of that factor would emasculate the mandatory nature of the July 1, 1977 compliance deadline. See *Bethlehem Steel Corp. v. Train*, 544 F.2d 657 (3d Cir. 1976), cert. denied, —— U.S. ——, 97 S.Ct. 1666, 51 L.Ed.2d 369 (1977). Also, as the Third Circuit noted in *Bethlehem Steel*, Congress considered and rejected a provision of the House bill,[47] which would have enabled EPA to grant a hardship exception to the July 1, 1977 compliance deadline when it "determines that it is not possible either physically or legally to complete the necessary construction within the statutory time limit." Although Congress' failure to enact this extension provision is not conclusive of its intent, it does offer some further confirmation of our conclusion that U. S. Steel was required to

---

**45.** A variation of this argument is considered *infra*, Part IV, E, with respect to U. S. Steel's contention that the compliance schedules in the permit are arbitrary.

**46.** Our interpretation of this Act is "guided by" the Supreme Court's interpretation of the analogous Clean Air Act. See *American Meat Inst. v. EPA, supra*, 526 F.2d at 449–450.

**47.** H.R. 11896, proposed § 301(b)(5).

litigate on its own time. *Id.*, 544 F.2d at 662.[48]

(b) *Interim Limitations*

Sustaining EPA's conclusions that recycling is BPT and that Gary Works is not entitled to a variance from the limitations based on BPT, does not, however, end our inquiry. U. S. Steel also challenges EPA's § 304(b)(1)(A) calculation of "the degree of effluent reduction attainable through the application of [BPT]" at Gary Works, reflected in the interim TSS limitations. EPA calculated those limits by estimating the flow of water in the recycling system, the TSS concentration in the recycling flow, and the volume of water discharged from the system, or blowdown.[49] EPA then multiplied the blowdown volume, expressed in gallons of water per ton of iron cast, by TSS concentration figure, and multiplied the product by a daily iron-production figure. The daily average effluent limitation on TSS discharges was the result of these computations.

U. S. Steel does not question EPA's engineering analysis of the water flows or TSS concentration levels in the proposed recycling system. The company's argument is that EPA's use of a daily iron-production figure of 13,500 tons for outfall # 017 was improper. Both parties agree that the entire Gary Works produces an average of 20,000 tons of iron each day. About 6,500 tons of this total is usually cast by one blast furnace, number 13, which is a new furnace with its own recycling system that does not discharge through outfall # 017. Only the older furnaces, numbers 1–12, discharge through that outfall. The evidence also establishes that these older furnaces have produced up to 16,700 tons of iron in one day, and that furnace 13 has produced at least up to 8,700 tons in one day. The capacity of furnaces 1–12 is 19,971 tons per day; only eight of them need to be in operation for the group to cast 13,500 tons. U. S. Steel's memorandum prepared pursuant to the Regional Administrator's Order of Remand acknowledged that "some" of furnaces 1–12 are not operating at the present time.

■ Our review of the record persuades us that substantial evidence supports EPA's use of 13,500 tons as the average daily iron-production figure for the blast furnaces served by outfall # 017. U.S. Steel does not contend that this is not the normal production figure. Rather, it argues that, if furnace 13 were out of service or unable to produce at capacity for some reason, the production slack might be taken up by furnaces 1–12, resulting in higher water and TSS discharges from outfall # 017. The company argues, in effect, that the permit should be based, not an actual production, but on the capacity of furnaces 1–12, because one day they might be required to produce up to that figure. We reject this claim. If special circumstances, such as relining or repair, require U.S. Steel to shut down furnace 13, a modification of the permit can be sought.[50] The interim limit on the daily average TSS discharges from outfall # 017 reflects the usual operations at Gary Works. The daily maximum represents a 50 percent increase over the daily average discharge, permitting occasional increases in blowdown flows or TSS concentrations. Moreover, EPA's use of a 50 mg/liter figure, instead of the projected operating level of 36 mg/liter, in calculating the TSS concentrations in the blowdown and recycling waters resulted in limitations which give U.S. Steel a measure of operating flexibility. We uphold the interim ef-

---

**48.** This holding implicitly disposes of U. S. Steel's most recently filed motion for a stay of the interim limitations at outfall # 017.

**49.** 40 C.F.R. § 401.11(p) defines "blowdown."

**50.** Although paragraphs 12 and 22 of the permit apparently contemplate modification only in the direction of greater stringency, EPA is certainly not foreclosed from temporarily adjusting permit limitations to accommodate a situation such as that described in the text. Alternatively, U.S. Steel may seek a new permit, as is provided in the regulations concerning "facility expansions, production increases, or process modifications which result in new or increased discharges of pollutants . . . ." 40 C.F.R. § 125.22(a)(1).

fluent limitations on TSS discharges from outfall # 017.

U.S. Steel argues in its reply brief that EPA "completely failed to determine limitations for other contaminants"[51] when it calculated the "degree of effluent reduction" attainable by converting to blast-furnace recycling. As an argument raised for the first time in the reply brief, it need not be considered. *American Meat Institute v. EPA, supra,* 526 F.2d at 462. We observe, however, that here too U.S. Steel misses the distinction between the technology-based effluent limitations required by § 301(b)(1)(A) and the limitations based on state law required by § 301(b)(1)(C). U.S. Steel could not have benefited if EPA had first determined the effect of recycling on other pollutants: Indiana standards impose a ceiling on pollutants, which cannot be raised whatever the effect of recycling.

### (c) *Final Limitations*

The interim limitations for TSS discharges from outfall # 017 are 1,688 pounds daily average and 2,532 pounds daily maximum. The permit's final limitations require U.S. Steel to reduce its TSS discharges to 500 pounds daily average and 750 pounds daily maximum by July 1, 1979. The Regional Administrator found that these limits can be achieved by installing a system which treats the blowdown from the recycling system,[52] and that U.S. Steel must install such a system in any event, in order to achieve the effluent limitations based on state law. Alternatively, he found that "improved efficiency of operation of the recycle system" could achieve these limitations.[53] U.S. Steel's challenge to this find-ing is the conclusory assertion that "[t]he proper application of blast furnace recycle technology will *not* result in compliance with those final effluent limitations for suspended solids." (Emphasis in original.) The Regional Administrator's findings were based on two EPA exhibits introduced at the administrative hearing on remand. Inasmuch as these exhibits were not included in the parts of the record brought here by the parties,[54] we cannot examine them and must assume that they support the findings.

### (3) *Cooling-Water Intake Structures*

The permit also requires U.S. Steel to conduct an intake monitoring program, as part of a study of the environmental impact of the cooling-water intakes for Gary Works, and to submit a proposal for meeting the § 316(b) requirement that

> "the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact."

U.S. Steel objects to this condition, arguing that this requirement may not be applied to it because Congress only intended that steam-electric generating plants be required to comply with § 316(b), and that § 402(a)(1) does not allow EPA to condition NPDES permits upon compliance with § 316(b).

▮ We reject these arguments. First, § 316(b) applies on its face to all technology-based effluent limitations "applicable to a point source." U.S. Steel asks us to rely on an isolated remark in the legislative history to reject the plain meaning of the statute.[55] EPA, which is the agency

**51.** In fact the guidelines reflect such a determination, based on recycling flows somewhat higher than those proposed for the Gary Works, with respect to cyanide, phenol, and ammonia. See 40 C.F.R. § 420.42.

**52.** EPA proposed a system combining neutralization, two-stage oxidation, clarification, pressure filters, and adsorption.

**53.** In fact, EPA suggested at the remand hearing that TSS discharges eventually could be reduced to 141 lbs. daily average and 211 lbs. daily maximum, by reducing blowdown to the

125 gal/ton rate discussed in the Development Document for Phase I guidelines and approved for new sources and, effective in 1983, for existing sources. See *AISI v. EPA, supra,* 526 F.2d at 1063.

**54.** See note 24, *supra.*

**55.** Representative Clausen's discussion of § 316(b) describes it as applying to steam-electric generating plants, apparently excluding any other industry which employs cooling-water intake structures. *Leg.Hist.,* at 264.

charged with enforcing this statute, construes § 316(b) to apply to all point sources. That interpretation of the statute comports with its plain meaning, and we accept it. Second, as § 316(b) itself makes clear, these requirements are to be implemented through standards established pursuant to §§ 301 and 306. Thus § 402(a)(1) implicitly requires the Administrator to insure compliance with § 316(b) as one of the permit conditions. See also *Appalachian Power Co. v. Train, supra,* 545 F.2d at 1371–1372.

■ U.S. Steel's argument that, even if applicable, the permit provision is unreasonable must also be rejected. Not even a "rough cost-benefit analysis" is necessary as a basis for the requirement that the company conduct a study of the impact of the present cooling-water intake structures on aquatic life in Lake Michigan. Such a study, intended to assist EPA in developing § 316(b) effluent limitations, is well within the agency's § 308 authority.[56] Finally, the company's complaint regarding EPA's failure to compare the costs and benefits of the various technologies available to reduce the adverse environmental impacts of cooling-water intake structures comes too soon. No particular control methods are required by the permit, and we trust that EPA will conduct a limited cost-benefit analysis once the information on which an evaluation of the various technologies can be made becomes available. Accordingly, we affirm the cooling-water intake provision of the permit.

### C. *Monitoring Requirements*

U.S. Steel has two basic complaints regarding the monitoring required by the permit: it is to be done too often and at too many places.

The initial monitoring requirements contained in the permit correspond closely to U.S. Steel's present monitoring practices, as required by the Indiana Stream Pollution Control Board.[57] The final requirements increase the monitoring at all process-water outfalls, requiring daily monitoring for several pollutants as well as temperature and continuous monitoring for flow and pH at several outfalls. Both the remaining process-water and all cooling-water outfalls will be monitored once a week for several pollutants and once a month for others. All the monitoring requirements exceed those proposed by U.S. Steel and present levels, both in the frequency of measurement and in the number of pollutants for which measurements must be taken.

Section 308 of the Act grants the Administrator broad authority to require NPDES permittees to monitor "at such locations [and] at such intervals" as he shall prescribe, "[w]henever [it is] required to carry out the objective of [the Act]." Similarly, § 402 vests him with authority to "prescribe conditions for [NPDES] permits . . . including conditions on data and information collection . . . ." We conclude that the monitoring requirements set forth in the permit are within this broad authority.

■ EPA considered four factors in determining the monitoring requirements, and set the requirements separately for each outfall. These factors were: the nature of the discharges and their impact on the receiving stream; the variability of the discharges; the volume of water discharged; and the present monitoring prac-

---

That remark, however, follows closely his reference to such plants, as an example, when explaining why the special treatment of thermal discharges established by § 316(a) was appropriate. *Leg.Hist.*, at 263. The legislative history is thus ambiguous at best.

**56.** See Part IV, C, *infra.* See also § 104(t) of the Act, which requires the Administrator to study thermal discharges and to evaluate alternative methods of controlling them, in order to implement § 316.

**57.** The twelve primarily cooling-water outfalls now monitored once every eight days will be monitored once a week. Three of the seven primarily process-water outfalls will be monitored on a daily basis, while the other four will remain at the present frequency of five times in eight days. A variety of pollutants will be monitored at each outfall, depending upon the composition of its present discharges.

tices of U.S. Steel. These factors are proper, and the record establishes that they were given appropriate weight by EPA. For example, because of the higher concentrations and greater variety of pollutants present in process water, the permit appropriately requires more frequent monitoring of process-water discharges than of cooling-water discharges. Similarly, more frequent monitoring was required at those outfalls which tended to fluctuate in the amount and quality of their discharges.

The monitoring requirements—similar to or less stringent than those imposed in the approximately 50 other steel-plant permits issued in Region Five—will not work an unjustified economic hardship on U.S. Steel. The chief difference between U.S. Steel's present monitoring practices and the initial requirements is that compliance at nine of the outfalls will be based on a 24-hour composite sample rather than the 8-hour composite sample presently prepared. The use of the 24-hour composite sample is extended to all outfalls by the final monitoring requirements. These changes will more than triple the number of samples taken. The use of a 24-hour composite sample will doubtless be more expensive than present monitoring practices, but it will present a more complete picture of the discharges from the Gary Works, reflecting fluctuations over the course of an entire day of production. At the outfalls monitored on a daily basis, it will allow an almost continuous check on the performance of the treatment facilities at Gary Works.

By comparison, U.S. Steel's permit proposals call for monitoring only once a week, even at the seven outfalls now sampled five times in eight days, and would replace the monitoring for several pollutants now conducted at each outfall with monitoring at the Pennsylvania Railroad Bridge, four-and-one-half miles downstream. Monitoring at each outfall enables the permittee and EPA to pinpoint the source of any discharges that exceed the plant-wide limitations on particular pollutants. Furthermore, the U.S. Steel proposal would, in effect, allow it to use the four-and-one-half mile stretch of the river as an extended treatment facility, something hardly contemplated by either the Indiana water quality standards or the FWPCA.

We cannot say that EPA exceeded its authority or acted unreasonably when it determined that regular and frequent monitoring at each outfall is necessary to insure prompt detection and rectification of permit violations. Therefore, we affirm the initial and final monitoring requirements set forth in the permit.

### D. *Deep Well*

The permit imposes effluent limitations and study and monitoring requirements on U.S. Steel's discharges of acid wastes into a deep well.[58] U.S. Steel challenges EPA's legal authority to impose these restrictions,[59] citing the language of the Act, *United States v. GAF Corp.*, 389 F.Supp. 1379 (S.D.Tex.1975),[60] and the legis-

---

58. The permit limits U.S. Steel to its current discharges into the well, and requires continuous monitoring of flow, temperature, pH, and injection and annular pressure, as well as daily monitoring for chloride, chromium, sulphate, and dissolved (and total) iron discharges. The permit also requires U.S. Steel to submit maps, descriptions, and geologic and engineering data on the deep well, and to prepare an extensive report regarding waste-injection well disposals, in order to enable EPA to evaluate the company's practices.

59. Although U.S. Steel argued before the Regional Administrator that the specific permit conditions imposed on deep-well discharges were unreasonable, it has limited its challenge in this court to EPA's authority to. regulate deep wells.

60. This decision is distinguishable in any event. Inasmuch as GAF's proposed injection disposal would not have violated any established effluent limitations or permit conditions, and therefore no enforcement action could have been brought under § 309, there was an alternative basis for the court's judgment. In our case, of course, there is a permit condition regarding well disposal. Furthermore, EPA's attempt to regulate GAF's discharges was not part of an overall effort to limit surface discharges. Finally, as the district court itself pointed out, GAF had obtained a permit for the proposed discharges from the Texas Water Quality Board. Compare *United States v. Armco Steel Corp.*, 333 F.Supp. 1073 (S.D.Tex. 1971).

852

lative history of the Act on which that decision is based. We reject U.S. Steel's argument.

■ The statute authorizes EPA to regulate the disposal of pollutants into deep wells, at least when the regulation is undertaken in conjunction with limitations on the permittee's discharges into surface waters. Section 402(a)(1) provides that the EPA's permit program "shall be subject to the same terms, conditions, and requirements as apply to a state permit program." And EPA approval of a state's permit program, governing "discharges into navigable waters," is conditional upon EPA's conclusion that the state program includes "adequate authority . . . '[t]o issue permits which . . . control the disposal of pollutants into wells." Section 402(b)(1)(D). Thus EPA's administration of an interim NPDES permit program concerning surface discharges includes the authority to control disposals into wells.[61]

The general provisions and definitions of the FWPCA support this view of EPA's authority. Section 402(a)(1) empowers the Administrator to "issue a permit for the discharge of any pollutant, or combination of pollutants," provided certain conditions are met. "Pollutant" is defined in § 502 of the Act to include "chemical wastes . . discharged into water." Section 502(6). One exception to the definition of "pollutant," § 502(6)(B), provides that

"pollutant . . . does not mean . . . (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well . . . ."[62]

■ ■ Applying the canon *expressio unius est exclusio alterius* to the quoted language, we conclude that the listed materials are "pollutants" when injected into wells under any other circumstances. U.S. Steel does not deny that its acid discharges into the deep well are "chemical wastes" within § 502(6). Therefore, their discharge into the deep well may properly be regulated by the permit-granting authorities pursuant to § 402(a)(3) and (b).

The legislative history also supports our construction of the statute. Exhibit 1, accompanying Senator Muskie's report of the conference committee on S. 2770 (the Act),[63] states as follows:

"The Conferees intend that this provision [§ 502(6)(B)] assure that no injection or disposal occur in such a manner as to present a potential hazard to ground water quality." *Leg. Hist.*, at 178.

During the House debate on the report of its conference committee, Representative Kemp stated that because

"[f]or the first time ground waters have been given the same emphasis as surface

---

**61.** This interpretation accords with that of EPA's General Counsel. See, *e. g., Decision of the General Counsel No. 6* (April 8, 1975). For another discussion of this issue see Wilson, *Ground Waters: Are They Beneath the Reach of the Federal Water Pollution Control Act Amendments?"* 5 Environmental Affairs 545 (1976). See also H.R.Rep.No. 93–1185, 93d Cong., 2d Sess. (1974); U.S.Code Cong. & Admin.News 1974, p. 6454, stating that one reason for adopting the Safe Drinking Water Act, 88 Stat. 1660 (1974), was that the FWPCA "may not authorize any regulation of deep well injection of wastes which is not carried out in conjunction with a discharge into navigable waters." *Id.* at 4; U.S.Code Cong. & Admin. News 1974, p. 6457.

In its brief, U.S. Steel argues that there is no jurisdiction under FWPCA to regulate deep wells that do not discharge into navigable waters and points to "unrefuted testimony at the adjudicatory hearing" that its deep well

injection "is into ground waters which do not connect into or otherwise affect surface waters." EPA, however, was not bound by this testimony and could have properly concluded that too little is known about the effects of discharges into ground waters to justify allowing increases in them. As to the company's legal argument, see the analysis of the statute and the legislative history in the text, *infra.*

**62.** There are two conditions to this exception: (1) approval by the state and (2) a determination, also by the state, that the disposal "will not result in the degradation of ground or surface water resources."

**63.** The Senate bill was eventually enacted into law. It was accompanied by S.Rep.No.92–414, 92nd Cong., 1st Sess. (1971); U.S.Code Cong. & Admin.News 1972, p. 3668.

waters . . . [the Act is] an important step forward in the protection of the underground environment . . .." [64]

Similarly, the report on the House version of the Act notes its committee's intent that

"the exclusion from the term 'pollutant' . . . appl[y] only to the properly executed injection of materials into wells to stimulate the primary, secondary, or subsequent production of crude oil or natural gas, and to the properly executed disposal in wells of brines derived in association with [their] production . . .." [65]

Finally, the Senate Report which accompanied S. 2770 notes that EPA is to prepare "guidelines for disposal of material in deep wells," *Leg. Hist.*, at 1471, and explains that, while federally imposed standards for ground waters are not contemplated, state regulation under § 402 is required "to protect ground waters and eliminate the use of deep well disposal as an uncontrolled alternative to toxic and pollution control." [66] *Leg. Hist.*, at 1491.

## E. Schedules of Compliance

In addition to the specific discharge limitations discussed above, the permit includes schedules of compliance designed to insure that the effluent limitations required by the permit are achieved in a timely fashion.[67] These items are included in the permit pursuant to the Administrator's authority under §§ 301, 401, and 502(11) and (17).

U.S. Steel does not challenge EPA's authority to set reasonable schedules of compliance under these statutory provisions. Instead, the company argues that the schedules set in the permit are arbitrary, that EPA's delay in promulgating nationally applicable effluent guidelines entitles it to an extension of the July 1, 1977 deadline for achieving BPT–based effluent limitations, and that the statute is satisfied if the permittee, before the deadline, initiates a program which will eventually achieve compliance with the limitations. We reject these arguments, and substantially approve the schedules of compliance as they are set forth in the permit under review.

---

**64.** *Leg. Hist.*, at 275. Representative Kemp also stated that, notwithstanding this coverage, he still planned to press for his own bill, "which would more comprehensively control the subsurface injection of wastes." *Leg. Hist.*, at 275.

**65.** *Leg. Hist.*, at 818. This is H.Rep.No.92–911, 92d Cong., 2d Sess. (1972), which accompanied the House bill, H.R. 11896.

**66.** In fact, even that legislative history on which U.S. Steel and the *GAF* court chiefly rely supports our interpretation of the Act. U.S. Steel urges that the rejection by the House of an amendment which would have established extensive federal regulation of ground waters demonstrates that EPA lacks authority over the waste-injection well. Representative Aspin's proposed amendment, however, had two purposes: in addition to establishing federal regulatory authority over all ground waters, it would have deleted the exception for oil-and-gas-related injections contained in § 502(6). The debate on this amendment clearly demonstrates that it was intended to

"eliminate the inconsistency between the way we treat oil companies in this bill and the way we treat other companies. Oil companies and other industries can pollute ground water, through the operation of what are called 'waste injection wells.' . . . The steel industry sinks wells into the ground

to get rid of waste. The oil industry does it . . . .. [Yet] *waste injection wells of the steel industry are covered.* The waste injection wells of every industry except oil are covered." (Emphasis supplied.) Remarks of Rep. Aspin, *Leg. Hist.*, at 589–590.

The significance of this "exception" becomes clear when one realizes that 99 percent of all domestic waste-injection wells are oil industry wells. *Leg. Hist.*, at 590. Representative Roberts explained his opposition to the amendment by pointing out that "we have more stringent regulations now on the oil industry than we could ever impose through this legislation." Thus, although the steel companies "come under the regulations" as Representative Aspin noted, the oil industry is "already . . . regulated in a similar fashion . . .." *Leg. Hist.*, at 593. The House debate on the amendment, therefore, confirms our conclusion that the Act contemplates state and federal restrictions on waste disposals into wells.

**67.** Schedules are established concerning the thermal limitations, the deep well, the plant-wide weight limits on the discharges of six chemicals into the Grand Calumet River, the elimination of all discharges other than non-contact cooling water from outfalls # # 021 and 033, and the specified effluent limitations set for eight other outfalls, # # 007, 015, 017, 018, 034, 037, 038, and 039.

First, we disagree with U.S. Steel's general characterization of the schedules of compliance as "arbitrary, capricious and without foundation." These schedules were established with the required levels of effluent reduction and the statutory deadlines in mind and appear to us to be on the whole reasonable.

██ U.S. Steel points out that several of the compliance dates had already passed by the time the permit was issued. We do not take these clearly unfair permit conditions as lightly as it appears the agency itself does. Regardless of whether they were due to a mere "quirk of administrative procedure," as EPA asserts, the inclusion of dates which have already passed and therefore cannot be complied with is inexcusable. Fortunately, there was no prejudice to U.S. Steel from these inclusions, because EPA itself recognized that no enforcement action could be brought for non-compliance with those dates without violating due process. And, as the agency observes, § 309(a)(3) gives the Administrator discretion to issue a compliance order *in lieu* of bringing a civil action.[68] The presence of the invalid parts of the schedules, which have not prejudiced U.S. Steel, does not require us to invalidate the schedules in their entirety.[69]

██ U.S. Steel's second argument, that EPA's delay entitles it to an extension, must be rejected in view of the mandatory nature of the deadlines contained in § 301(b). As we observed in our discussion of the company's claim that temporal infeasibility made recycling not "currently

available" to it, the congressionally imposed deadline of July 1, 1977 is a firm one.[70] We agree with the view expressed by the Third Circuit in *Bethlehem Steel Corp. v. Train, supra,* 544 F.2d at 663, that "it [is] not for the courts to upset that Congressional decision." As the Supreme Court noted in an analogous context, such a statutory deadline is not subject to judicial nullification. *Union Electric Co. v. EPA, supra,* 427 U.S. at 269, 96 S.Ct. 2518.[71]

██ Under the FWPCA, EPA was required to promulgate § 304 guidelines for various industries by October 18, 1973. Sections 304(b)(1)(A) and 306. *Natural Resources Defense Council, Inc. v. Train, supra,* 510 F.2d at 704–705. The agency did not promulgate guidelines for the iron and steel industry, however, until compelled to do so by that decision. 39 Fed.Reg. 24114 (June 28, 1974). U.S. Steel argues that this delay in the statutory timetable either nullifies the July 1, 1977 deadline or entitles it to an extension of the time for compliance. We do not believe Congress intended such a result. U.S. Steel's permit was first issued in October 1974, well before the January 1, 1975 deadline apparently contemplated by Congress for the issuance of permits. See § 402(k); see also *Natural Resources Defense Council, Inc. v. Train, supra,* 510 F.2d at 706–710. Although EPA's guidelines were then in effect, BPT and the resulting effluent limitations would have been determined in the permit proceeding itself if they had not yet been promulgated. *Id.* at 709. Thus, it appears that the obligations imposed on an individual discharger by the

68. At least with respect to dates that had already passed before the effective date of the permit, no successful criminal proceeding could be brought under § 309(c), for lack of the requisite mental state.

69. U.S. Steel's other claims of arbitrariness, *viz.,* impossibility of compliance and improper effluent limitations underlying the schedules, merely repeat arguments rejected earlier in this opinion or refuted by our examination in the order of the limitations set for specific outfalls.

70. Unless Congress amends the statute, as it may do this year. See National Commission on Water Quality, Report to Congress 15–17 (1976), and Comptroller General, Implementing

the National Water Pollution Control Permit Program: Progress and Problems (February 1976).

71. U.S. Steel relies upon an unreported ruling by the Second Circuit, which stayed the enforceability of certain effluent limitations and guidelines (subparts B and C of 40 C.F.R. part 409) for over a year. That was, however, simply an order granting a stay pending oral argument. The court's final decision in the case did not even mention the stay. *California & Hawaiian Sugar Co. v. EPA,* 553 F.2d 280 (2d Cir. 1977). In any event, we prefer the view of the Third Circuit.

permit are enforceable according to the statutory timetable whether or not they are based on previously issued guidelines.

U.S. Steel does not argue that the remand of the iron and steel guidelines and the resulting remand of this permit proceeding themselves justify an extension. As we have already held with respect to recycling as BPT, U.S. Steel must litigate on its own time. *Cf. Train v. Natural Resources Defense Council, supra,* 421 U.S. at 92, 95 S.Ct. 1470.

U.S. Steel's final argument is that the statute itself allows the July 1, 1977 deadline to be met simply by beginning action on a schedule of compliance which will eventually result in achieving the limitations based on BPT or state regulations. We reject this contorted reading of the statute. We recognize that the definition of "effluent limitation" includes "schedules of compliance," § 502(11), which are themselves defined as "schedules . . . of actions or operations leading to compliance" with limitations imposed under the Act. Section 502(17). It is clear to us, however, that § 301(b)(1) requires point sources to achieve the effluent limitations based on BPT or state law, not merely to be in the process of achieving them, by July 1, 1977. See *Bethlehem Steel Corp. v. Train, supra,* 544 F.2d at 662.[72]

Therefore we uphold the schedules of compliance set forth in the permit. We also deny U.S. Steel's recently filed motion for a stay pending appeal of the schedule of compliance contained in the permit for the installation of blast-furnace recycling at outfall # 017.

The District Court's decision in No. 76–1425 is Affirmed. In No. 76–1616 the Petition for Review is Denied.

---

**72.** As the Supreme Court observed in connection with the Clean Air Act, see *Union Electric Co. v. EPA, supra,* 427 U.S. at 268, 96 S.Ct. 2518, § 309(a) gives the Administrator the option of issuing a compliance order rather than instituting civil or criminal enforcement proceedings. See also *Bethlehem Steel Corp. v. Train, supra,* 544 F.2d at 659–660.