**STATE WATER CONTROL BOARD, an agency of the Commonwealth of Virginia, Appellant,**

v.

**Russell E. TRAIN, Administrator United States Environmental Protection Agency, Newton Ancarrow, individual petitioner for intervention, Appellees,**

**Natural Resources Defense Council, Inc., Amicus Curiae.**

No. 76–1320.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1976.

Decided July 13, 1977.

---

**10.** Although the testimony would indicate that some small portion of the loan ended up in a business account in which Adam had an interest, the record is barren of any indication that the monies from the business account benefited anyone other than Figueroa.

**11.** Although the Bank has urged that it should prevail because it is a holder in due course as defined under the Uniform Commercial Code, 11A V.I.C. § 3–305, we do not rely on that status in holding Garcia and Suh to their endorsements. While we note that a payee may indeed be a holder in due course under the Code, *id.*, § 3–302(2), one who has dealt directly with a party to the instrument is granted only the rights accorded a simple holder, *id.* § 3–305(2); *see* J. White & R. Summers, Hand-

book of the Law Under the Uniform Commercial Code § 14–7, at 478–79 (1972). Those rights are derived from basic contract law rather than from any provisions of the Code. 11A V.I.C. § 3–306; J. White & R. Summers, *supra,* § 14–11, at 490–91.

The documents signed by Garcia and Suh were signed not only as endorsements but a "Statement of Endorser" form signed by each provided, "I understand that I shall be responsible for payment should Jose Figueroa default in payment." Further, the endorsement legend signed by both provided: "The undersigned, jointly and severally, intending to be legally bound, guarantee the prompt payment of principal and interest. . . . ."

James E. Ryan, Jr., Deputy Atty. Gen., Richmond, Va. (Andrew P. Miller, Atty. Gen. of Virginia, and David E. Evans, Asst. Atty. Gen., Richmond, Va., on brief), for appellant.

Larry A. Boggs, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Washington, D. C., William B. Cummings, U. S. Atty., Alexandria, Va., Charles L. Beard, Asst. U. S. Atty., and Edmund B. Clark, and Jacques B. Gelin, Attys., Dept. of Justice, Washington, D. C., on brief), for appellee Russell E. Train, Administrator, U. S. E. P. A.

David S. Favre, Detroit, Mich., on brief, for appellee Newton Ancarrow.

Edward L. Strohbehn, Jr., Washington, D. C., on brief, for amicus curiae.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

The State Water Control Board of the Commonwealth of Virginia brought this action against the Administrator of the United States Environmental Protection Agency (EPA) on behalf of the Commonwealth of Virginia and certain of her political subdivisions, seeking a declaration that the effluent limitations of Section 301(b)(1) of the Federal Water Pollution Control Act Amendments of 1972 (FWPCA) [1] do not apply to publicly owned sewage treatment plants which have not received federal grants under Title II [2] of the FWPCA.[3]

---

1. The FWPCA is codified as 33 U.S.C. § 1251, *et seq.* Section 301(b)(1) is 33 U.S.C. § 1311(b)(1).

2. Title II is codified as 33 U.S.C. §§ 1281–1292.

3. The complaint requested the district court to declare, *inter alia,* that

for each publicly-owned sewage treatment plant that cannot be put into compliance with the July 1, 1977, deadline under § 301(b)(1)(B) of the Act, such plant shall not be required to comply with applicable limita-

The district court denied the relief sought[4] and the Board appeals. For the reasons stated below, we affirm.

### I.

The FWPCA seeks to eliminate the discharge of pollutants into the navigable waters by 1985 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[5] As an initial step toward that goal,[6] Section 301(b)(1)(B) requires publicly owned treatment works[7] to achieve, by July 1, 1977, the degree of effluent reduction attainable through application of secondary treatment.[8] In addition, such plants must satisfy any limitations which are necessary to implement any applicable water quality standard.[9]

These criteria are applied to individual treatment plants primarily through the national permit system established by Section 402.[10] Under that system, no person may discharge pollutants without a permit issued by EPA or an EPA-approved state permit program.[11] Section 402 requires that such permits be conditioned on compliance with the requirements of, *inter alia,* Section 301. Discharge of pollutants without a permit or in violation of a permit condition may result in civil and criminal penalties as well as injunctive sanctions.[12]

To assist in financing the facilities necessary to accomplish the effluent reductions mandated by Section 301, Title II of the Act establishes a program of federal grants to states, municipalities and intergovernmental agencies for the construction of publicly owned treatment plants. Section 202(a)[13] provides that the amount of any grant made under this program[14] shall be 75% of approved construction costs; and Section

---

tions under [that section] until such time as federal grant funds are available in an amount sufficient to underwrite 75% of the eligible cost of construction thereof and a reasonable time has been allowed to complete the necessary construction.

**4.** The district court's opinion is reported at 8 E.R.C. 1609.

**5.** FWPCA § 101(a)(1), 33 U.S.C. § 1251(a)(1).

**6.** The Act contemplates a two-phase reduction in pollutant discharges. Second phase standards, to be achieved by July 1, 1983, are set forth by FWPCA § 301(b)(2), 33 U.S.C. § 1311(b)(2). They are not directly in issue here.

**7.** Point sources other than publicly owned treatment works are subject to FWPCA § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A), which mandates application, by July 1, 1977, of "the best practicable control technology currently available." The term "point source" refers to "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." FWPCA § 502(14), 33 U.S.C. § 1362(14).

**8.** The degree of effluent reduction attainable through the application of secondary treatment is determined by reference to information published by EPA pursuant to FWPCA § 304(d)(1), 33 U.S.C. § 1314(d)(1).

**9.** FWPCA § 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C).

"Water quality standards" relate to the characteristics of the body of water into which pollutants are being discharged. "Effluent limitations," on the other hand, are restrictions on the type and amount of pollutants which may be discharged from a particular point source. For discussion of the differences between effluent limitations based on water quality standards and technology-based effluent limitations such as those established by FWPCA § 301(b)(1)(A) & (B), *see, e. g.,* Davis and Glasser, *The Discharge Permit Program Under the Federal Water Pollution Control Act of 1972— Improvement of Water Quality Through the Regulation of Discharges from Industrial Facilities,* II *Fordham Urban L. J.* 179, 189–235 (1974).

**10.** 33 U.S.C. § 1342.

**11.** *See* FWPCA §§ 301(a) and 402(a) and (b), 33 U.S.C. §§ 1311(a) and 1342(a) and (b).

**12.** The Act authorizes civil actions against violators by EPA, FWPCA § 309(b), 33 U.S.C. § 1319(b), or by private citizens, FWPCA § 505, 33 U.S.C. § 1365. In such suits, the court can impose civil penalties as great as $10,000 for each day that a violation has existed and can enjoin further violations. A successful private plaintiff may be awarded attorney's fees and costs, FWPCA § 505(d), 33 U.S.C. § 1365(d).

**13.** 33 U.S.C. § 1282(a).

**14.** FWPCA § 204, 33 U.S.C. § 1284, sets forth limitations and conditions for the approval of individual grants.

$207$[15] authorizes the appropriation of $18 billion for fiscal years 1973 through 1975 for such grants.[16]

Unfortunately, however, the grant program's effectiveness in facilitating compliance with the 1977 effluent limitations has been limited. Grants have not been available for many construction projects because the money authorized by Section 207 is insufficient to finance 75% of the cost of every needed sewage treatment plant in the country.[17] Moreover, disbursement of the authorized funds has been substantially delayed by Presidential impoundment[18] and by the time consumed by administrative processing of grant applications.[19] These problems, together with the fiscal difficulties now confronting most State and local governments, have made it economically impossible for many localities to accomplish the required effluent reductions by the 1977 deadline.

15. 33 U.S.C. § 1287.

16. FWPCA § 205(a), 33 U.S.C. § 1285(a), directs EPA to allot the authorized funds among the States in direct proportion to the cost of needed facilities in each. For an individual project to receive a grant out of its State's allotment, the appropriate State agency must certify that it is entitled to priority over other projects in the State, FWPCA § 204(a)(3), 33 U.S.C. § 1284(a)(3).

17. Appellant asserts that the "federal share" of the construction costs of all needed facilities in Virginia exceeds Virginia's allotted share of the authorized funds by approximately $1.063 billion.

18. After the Act was passed over his veto, President Nixon, by letter dated November 22, 1972, directed the Administrator to allot among the States "[n]o more than $2 billion of the [$5 billion] authorized for the fiscal year 1973, and no more than $3 billion of the [$6 billion] authorized for the fiscal year 1974. . . ." For fiscal year 1975, the Administrator allotted only $4 billion of the $7 billion authorized for that year. However, *Train v. City of New York* (1975) 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 held that the Administrator lacks authority to allot less than the amounts specified by Section 207 and the impounded funds were finally allotted in fiscal year 1976.

19. The district court found that approval of a grant request requires approximately six months to one year.

Motivated by this circumstance, appellant contends that, under a proper construction of the Act, receipt of Title II grant money is a condition precedent to the duty to comply with the 1977 effluent standards. We cannot agree.

## II.

Our analysis begins with the undisputed fact that appellant's position is not supported by the text of the statute. Section 301(b)(1)'s effluent limitations are, on their face, unconditional; and no other provision indicates any link between their enforceability and the timely receipt of federal assistance.

Appellant, relying on the Act's legislative history, asks us to hold that such a link is, nevertheless, implicit in the statutory scheme. However, as the following discussion demonstrates, that history actually tends to reinforce the "plain meaning" of the text.[20]

20. Relying on *Caminetti v. United States* (1917) 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 appellee and amicus curiae suggest that we need not even consider the legislative history cited by appellant because the text of the statute is unambiguous. But, whatever may have been the rule at the time of *Caminetti* and *United States v. Missouri Pacific R. Co.* (1929) 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (setting forth the standard formulation of the "plain meaning rule"), it is now settled that available extrinsic interpretive aids may not be disregarded even though the statutory language appears to have a "plain meaning" which does not lead to an absurd result. *See, e. g., U. S. v. Amer. Trucking Ass'ns* (1940) 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345:

> When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

*Accord, Train v. Colorado Pub. Int. Research Group* (1976) 426 U.S. 1, 96 S.Ct. 2040, 48 L.Ed.2d 597 (holding that court of appeals erred in relying on the "plain meaning" of a statute when the legislative history clearly indicated another meaning) and *McMann v. United Air Lines, Inc.* (4th Cir. 1976) 542 F.2d 217, 221. *See also* Murphy, *Old Maxims Never Die: The "Plain Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts,* 75 Col.L. Rev. 1299 (1975).

However, the words of the statute remain the most persuasive indication of Congressional in-

As the Third Circuit has noted, "all discussion of this date [the July 1, 1977 deadline] in the legislative history indicates that Congress viewed it as an inflexible target." *Bethlehem Steel Corp. v. Train* (3d Cir. 1976) 544 F.2d 657, 661. The House committee report on the bill which became the FWPCA states:

> It is the intention of the Committee that the requirements of section 301(b)(1)(A) and (B) be met by phased compliance between the date of enactment . . . and January 1, 1976, [now July 1, 1977] so that *all* point sources will be in full compliance *no later than* [July 1, 1977], except as any extension of time for compliance may be made in accordance with section 301(b)(3).[21] [H.R.Rep. No. 92–911, 92d Cong., 2d Sess., reprinted at S. Comm. on Public Works, 93rd Cong., 1st Sess., *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 788 (Comm. Print, 1973) (2 vols.) (hereinafter cited as "*Legis.Hist.*")] [Emphasis added.][22]

Senator Muskie, a principal author of the Act, commented that the July 1, 1977 deadline

> does not mean that the Administrator cannot require compliance by an earlier date; it means that these limitations must be achieved *no later than July 1,* 1977 . . . [*Legis.Hist.* 162] [Emphasis added.]

And finally, the Senate Report notes that the EPA must act quickly in determining whether particular point sources must satisfy the technology-base standards of Section 301(b)(1)(A) and (B) or more stringent water quality-based effluent limits under Section 301(b)(1)(C)[23] because

> [t]he deadlines established to achieve effluent limitations are strict [and] [s]ources of pollution, whether they are cities or industries, must know what the requirements are in order to proceed on schedule with their construction program. [S.Rep. No. 92–414, 92d Cong., 2nd Sess., U.S. Code Cong. & Admin.News 1972, pp. 3668, 3710 (1971), *Legis.Hist.* 1462.]

More importantly, Congress actually declined to write the statute as appellant would now have us construe it. During hearings on the House bill, William Ruckelshaus, then head of EPA, and appellee Train, then Chairman of the Council on Environmental Quality, urged that the Act permit extension of the 1977 deadline in cases where, despite good faith efforts, compliance is impossible.[24] Significantly, Mr. Ruckelshaus also recommended that "the secondary treatment requirement [of Section 301(b)(1)(B)] should only apply to

---

tent, and their apparent meaning should be rejected only on substantial, unambiguous evidence supporting a contrary interpretation. *See Gemsco, Inc. v. Walling* (1945) 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921:

> The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.

and *United States v. Dickerson* (1940), 310 U.S. 554, 562, 60 S.Ct. 1049, 1038, 84 L.Ed. 1356:

> Legislative materials may be without probative value, or contradictory, or ambiguous . . . and in such cases will not be permitted to control the customary meaning of words or overcome rules of syntax or construction found by experience to be workable . . . .

*Cf. Securities and Exchange Com'n. v. Sterling Precision Corp.* (2d Cir. 1968) 393 F.2d 214, 218. Thus, where the legislative history is conflicting or of uncertain significance, doubts should be resolved in favor of a normal reading of the statutory language.

**21.** Section 301(b)(3) of the House bill was not enacted into law. *See* text accompanying notes 27 and 28, *infra.*

**22.** Similarly, Congressman Jones a member of the Senate-House Conference Committee, stated:

> It is the intention of the managers that the July 1, 1977, requirements be met by phased compliance and that all point sources will be in full compliance *no later than* July 1, 1977. [*Legis.Hist.* at 231.] [Emphasis added.]

**23.** *See* notes 7–9 and accompanying text *supra.*

**24.** Letter from William D. Ruckelshaus, Administrator, EPA, to John A. Blatnik, Chairman, Committee on Public Works, House of Representatives, dated December 13, 1971, *Legis. Hist.* 1191–1208 at 1197; and Testimony of Russell Train, Chairman, Council on Environmental Quality, *Legis.Hist.* 1115.

projects for which new Federal grants are provided." [25] The bill which the House subsequently passed [26] empowered EPA to extend the 1977 deadline for up to two years in cases where compliance is physically or legally impossible; [27] but, despite the recommendation of Mr. Ruckelshaus, it did not limit the applicability of Section 301(b)(1)(B) to those facilities receiving federal assistance.[28] Moreover, even the provision authorizing case-by-case extension of the deadline was later deleted without comment by the Conference Committee. This clearly provides strong support for the conclusion that Congress meant for the July 1, 1977 deadline to be rigid and that it did not intend that sewage treatment plants not

receiving timely federal grants should be exempt from that deadline. *See, e.g., Gulf Oil Co. v. Copp Paving Co.* (1974) 419 U.S. 186, 199–200, 95 S.Ct. 392, 42 L.Ed.2d 378 and *Bethlehem Steel Corp. v. Train, supra* at 662. *See, also, Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 586 & 602–609, 72 S.Ct. 863, 96 L.Ed. 1153.

■ Appellant argues, however, that Congress would have so intended if it had foreseen the funding delays and shortfalls which have plagued the grant program. Like the court below, we are not convinced that Congress was, in fact, unaware that some necessary projects might not receive timely grants.[29] Nor, accepting that

25. *Legis.Hist.* 1197.

26. H.R. 11896, 92d Cong., 2d Sess. (1972), *Legis.Hist.* 893–1110.

27. In pertinent part, H.R. 11896 § 301(b)(3), 964–965, provided:

The Administrator may extend for any point source the dates prescribed in subparagraphs (A) and (B) of paragraph (1) of this subsection. No extension or extensions of such date shall exceed a total of two years from the date prescribed in such subparagraph. Public hearings must be held by the Administrator in connection with any such extension prior to granting such extension. No extension shall be granted unless the Administrator determines . . . that it is not possible either physically or legally to complete the necessary construction within the statutory time limit. . . .

28. Extension of the deadline on a case-by-case basis as authorized by H.R. 11896 § 301(b)(3), note 27 *supra*, is, of course, not the same as a blanket exemption for municipalities not receiving timely grants. While many municipalities may be unable to comply with the 1977 deadline without timely federal assistance, there is no reason to suppose, *a priori*, that this will be true in every case. Appellant's construction, however, would create a conclusive presumption to that effect.

29. The Act's legislative history is, as appellant stresses, replete with statements that the level of funding was based on a careful evaluation of the nation's water treatment needs. *See, e. g., Legis.Hist.* 115–22, 164, 265–66, 365–67, and 1452. It would appear, however, that most, if not all, of those comments were intended to refute the notion that the Act authorized overspending. Thus, while they establish that Congress knew that the grant program would need *at least* $18 billion, they do not prove that it

thought that *no more* than that amount would be required. Indeed, given Congress' desire to avoid a Presidential veto on the ground of overspending, *see Legis.Hist.* 165–66 and Letter from Senator Muskie to President Nixon, dated October 10, 1972, *Legis.Hist.* 141, it would not be unreasonable to surmise that it consciously chose to authorize a conservative level of funding. *See Legis.Hist.* 165 (remarks of Senator Muskie):

[A] Federal commitment of $18 billion . . . was the *minimum* amount needed to finance the construction of waste treatment facilities which will meet the standards imposed by this legislation.

\* \* \* \* \* \*

[T]he conferees are convinced that the level of investment that is authorized is the *minimum* dose of medicine that will solve the problems we face. [Emphasis added.]

Moreover, the report of the Senate Public Works Committee clearly indicates an awareness that the authorized funds might be insufficient to provide grants for all necessary construction:

The Committee asked the National League of Cities—United States Conference of Mayors to survey their members' cities to determine the need for Federal construction grant assistance. That study, . . . identified and estimated a waste treatment backlog of $33–$37 billion. While the funds authorized by this Act will not provide full Federal assistance to retire a backlog of that magnitude there should be adequate funds for communities to make major inroads into their construction backlog and begin to achieve the kind of a program anticipated by this legislation. [S.Rep.No. 92–414, 92d Cong., 2nd Sess., U.S.Code Cong. & Admin.News 1972, p. 3701 (1971), *Legis.Hist.* 34–35.]

Several individual congressmen made similar comments. *See, e. g., Legis.Hist.* 216 (remarks of Senator Bayh):

premise, is there any reason to believe that Congress would have expressly provided the blanket exemption now advocated by appellant if it had been accurately forewarned about the deficiencies which have surfaced in the grant program—it seems more likely that Congress' response, if any,[30] to such forewarning would have been to retain the provision of the House bill[31] empowering EPA to extend the deadline on a case-by-case basis where compliance is impossible.[32] But in any event, we do not think that, on the record before us, it is within our judicial function to speculate as to how Congress might have written the statute had it been more prescient. Where, as here, Congress has chosen not to incorporate a suggested provision into legislation, we must abide by that decision even though it appears in retrospect to have been based on a false premise. *Cf. Youngstown Co. v. Sawyer, supra.* In such cases, reconsideration of the

matter is a task for Congress, not the courts.[33]

## III.

■ Our holding in this case does not mean that, absent Congressional action, severe sanctions will inevitably be imposed on municipalities who, despite good faith efforts, are economically or physically unable to comply with the 1977 deadline. We fully expect that, in the exercise of its prosecutorial discretion,[34] EPA will decline to bring enforcement proceedings against such municipalities. Furthermore, in cases where enforcement proceedings are brought, whether by EPA or by private citizens, the courts retain equitable discretion to determine whether and to what extent fines and injunctive sanctions should be imposed for violations brought about by good faith inability to comply with the deadline.[35] In

Under the provisions of the bill, the allotments for my own State of Indiana for fiscal years 1974 and 1975 will amount to approximately $370 million—not enough to meet every need in my State, to be sure, but enough to make a very significant contribution to solving the problems we have.

and *Legis.Hist.* 100 (remarks of Congressman Fraser):

Minnesota's plans for construction of 140 sewage treatment plants will require $212 million in the coming year. Seventy-five percent of this—the maximum Federal share—would come to $159 million. Under [this] bill, Minnesota would be eligible for about $100 million.

**30.** It is conceivable that, given such forewarning, Congress would have chosen nevertheless to leave the statute as written, trusting to prosecutorial and judicial discretion to relieve any resulting inequities in individual cases, *see* notes 34 and 35 and accompanying text, *infra.* Indeed, if it is concluded that Congress did, in fact, foresee that the authorized funds might be insufficient to provide grants to all necessary projects, *see* note 29 and accompanying text, *supra,* then it is at least arguable that Congress consciously chose to do just that.

**31.** *See* notes 26–27 and accompanying text, *supra.*

**32.** We note that recent bills intended to alleviate the problems which underlie this suit have employed the case-by-case approach rather than the blanket exemption advocated by appellant. *See,* H.R. 9560, 94th Cong., 2d Sess.

§ 13 (1976), and H.R. 3199, 95th Cong., 1st Sess. § 13 (1977) (now pending).

**33.** Congress is, in fact, currently considering legislation which would deal with the problems faced by municipal dischargers. *See* H.R. 3199, 95th Cong., 1st Sess. (1977) which was reported with approval to the full House by the Public Works Committee on March 29, 1977, H.R.Rep.No. 95–139, 95th Cong., 1st Sess. (1977). Section 9 of H.R. 3199 authorizes $11 billion in funding for the grant program for fiscal years 1977–79. More importantly, H.R. 3199 § 13 authorizes EPA to extend the July 1, 1977 deadline for up to five years (six years in some instances) in cases where construction cannot be completed by the deadline.

H.R. 3199 is substantially the same as H.R. 9560, 94th Cong., 2d Sess. (1976) which passed the House by a wide margin but died in Conference.

**34.** For authority that EPA does have such discretion, *see, e. g., Committee for the Consid. of Jones Falls Sew. Sys. v. Train* (D.Md.1975) 387 F.Supp. 526, 529; *Sierra Club v. Train* (D.Ala. 1975) (No. 75–C–802); K. Davis, *Administrative Law Treatise,* § 4.07 (1958); *id.* (Supp. 1970).

**35.** Of course, such discretion must be exercised on a case-by-case basis and *not in a suit* such as this, seeking a blanket exemption. There is no conclusive presumption that a municipality not receiving timely federal assistance is economically unable to comply with the 1977 deadline.

exercising such discretion, EPA and the district courts should, of course, consider the extent to which a community's inability to comply results from municipal profligacy.

## CONCLUSION

For the reasons stated, we conclude the appellant is not entitled to the relief requested. Accordingly, the judgment of the district court is

*AFFIRMED.*