**HOMESTAKE MINING COMPANY**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Douglas M. Costle, Administrator United States Environmental Protection Agency, Alan Merson, Regional Administrator, Region VIII, United States Environmental Protection Agency.**

No. CIV 78–5027.

United States District Court,
D. South Dakota.

Oct. 16, 1979.

Robert D. Hiaring, U.S. Atty., Sioux Falls, S.D., Mark V. Meierhenry, Atty. Gen., Pierre, S.D., Laurence H. Edelman, Denver, Colo., Mark R. Sussman, Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

This case is before the Court on cross-motions for summary judgment. It concerns defendant South Dakota's adoption and Defendant Environmental Protection Agency's (EPA) approval of water quality standards under the Federal Water Pollution Control Act (FWPCA). These standards were incorporated in a National Pollution Discharge Elimination System (NPDES) permit issued to Plaintiff Homestake Mining Company.

## THE FWPCA

The cornerstone of the FWPCA is § 301(a), 33 U.S.C. § 1311(a) which prohibits "the discharge of any pollutant by any person" unless certain sections of the Act are complied with. *United States Steel Corporation v. Train*, 556 F.2d 822, 829 (7th Cir. 1977). An existing pollutant source, such as plaintiff, can continue to discharge waste pursuant to a NPDES permit. § 402, 33 U.S.C. § 1342. A permit is issued upon application and an opportunity for public hearing. It sets limits on the amount of pollutants that can be discharged from any one source.

The Act provides for two types of restrictions on the discharge of pollutants. First, there are federal technology-based effluent limitations which are established in two stages. The first stage is to be met by July 1, 1977, and is to be based upon "the best practicable technology currently available" (BPT). The second stage is to be met by July 1, 1984,[1] and is to be based on "the best available technology economically achievable" (BAT). § 301(b) 33 U.S.C. § 1311(b).

The second type of restriction on the discharge of pollutants is provided for in

A. P. Fuller, Lead, S.D., John C. Kapsner, Bismarck, N.D., for plaintiff.

---

1. The Act originally required the second stage to be met by July 1, 1983.

§§ 301(b)(1)(C) and 510, 33 U.S.C. §§ 1311(b)(1)(C) and 1370. In this case, plaintiff argues that these restrictions have been improperly implemented by the defendant.

## FACTS

Plaintiff contends that EPA's approval of South Dakota's water quality standards, which are somewhat stricter than those mandated by the FWPCA, was arbitrary, capricious and contrary to law. In 1974, South Dakota revised its water quality standards and designated Whitewood Creek for use as a cold water permanent fishery and for recreation in and on the water. This designation affected plaintiff in that plaintiff discharges waste into Gold Run Creek which is a tributary of Whitewood Creek. On October 28, 1977, South Dakota again revised its water quality standards as required by § 303(c) of the FWPCA, 33 U.S.C. § 1313(c). These revisions did not change the designation of Whitewood Creek as a cold water permanent fishery.

Under § 402(a) of the FWPCA, 33 U.S.C. § 1342(a), EPA issued draft NPDES permits to plaintiff in 1975 and 1976. These permits contained effluent limitations based on BPT and the more stringent state water quality standards. Plaintiff was given a chance for a hearing on the terms of its permit, but eventually declined this opportunity and accepted the permit on September 17, 1976. (See Exhibit A attached to Defendant EPA's brief in support of its motion for summary judgment.)

Plaintiff is now asking this Court to declare EPA's approval of South Dakota's more stringent water quality standards to be violative of the FWPCA. Such a declaration by this Court would free plaintiff from the requirements of its NPDES permit. In its prayer for relief plaintiff asks this Court to enjoin the application to it of both South Dakota's water quality standards and the Cheyenne River Basin Plan.

In support of its claim, plaintiff argues three main points: (1) That EPA's approval of South Dakota's water quality standards was arbitrary, capricious, an abuse of discretion and not in accordance with the FWPCA; (2) That §§ 302 and 303 of the FWPCA have been improperly interpreted, implemented and applied by the defendants; (3) That EPA's approval of the Cheyenne River Basin plan was arbitrary, capricious and not in accordance with the law. Each of these three issues will be addressed separately.

## EPA'S APPROVAL OF SOUTH DAKOTA'S WATER QUALITY STANDARDS

In revising its water quality standards in October of 1977, South Dakota's Board of Environmental Protection was instructed by counsel that South Dakota law did not allow the Board to consider economic or social factors in establishing these standards. (See Appendix A attached to plaintiff's brief in support of its motion for summary judgment.) These standards became effective on December 15, 1977, and were conditionally approved by EPA on March 15, 1978. Plaintiff argues that South Dakota's Board of Environmental Protection was required by the FWPCA to consider economic and social factors. Because it failed to do so, plaintiff further argues that EPA's approval of the standards was arbitrary and capricious. Plaintiff's claim is based on § 303(c)(2) of the FWPCA, 33 U.S.C. § 1313(c)(2) which reads as follows:

Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration the use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into con-

sideration the use and value for navigation.

The federal regulations implementing § 303(c)(2) are also relied upon by plaintiff:

The State shall establish water quality standards which will result in the achievement of national water quality goals specified in section 101(a)(2) of the Act, wherever obtainable. In determining whether such standards are obtainable for any particular segment, the State should take into consideration environmental, technological, social, economic, and institutional factors. 40 C.F.R. § 130.17(c)(1).

The language of the statute and the regulations must be studied in examining plaintiff's first claim. The FWPCA states that "standards shall be established taking into consideration" the various factors listed. The applicable federal regulation states that "the State should take into consideration" the various factors. It must, therefore, be determined what the phrase "taking into consideration" requires.

■ In *Weyerhaeuser Company v. Costle*, 191 U.S.App.D.C. 309, 590 F.2d 1011 (D.C. Cir. 1978), the Court considered § 304(b)(1)(B) of the FWPCA, 33 U.S.C. § 1314(b)(1)(B), which contains language requiring the EPA to take various factors into consideration in establishing certain regulations. In determining what this language meant, the Court stated:

Congress did not mandate any particular structure or weight for the many consideration factors. Rather, it left EPA with discretion to decide how to account for the consideration factors, and how much weight to give each factor. . . . More particularly, we do not believe that EPA is required to use any specific structure such as a balancing test in assessing the consideration factors, nor do we believe that EPA is required to give each consideration factor any specific weight. *Id.* 191 U.S.App.D.C. at 343, 590 F.2d at 1045.

Such reasoning should also be applied to the present case. Nothing in the statute seems to indicate that the states must give equal weight to all the factors listed. The *Weyerhaeuser* case indicates that the amount of weight to give each individual factor is within the State's discretion.

■ In support of its contention that EPA should have disapproved South Dakota's water quality standards, plaintiff cites *Kentucky v. Train*, 9 E.R.C. 1280 (E.D.Ky. 1976). In that case, EPA's disapproval of state standards was upheld because Kentucky's standards extended only to waters identified on the map entitled "Streams of Kentucky" rather than to all "waters of the United States" as required by the FWPCA. Plaintiff cites this case in support of its position that disapproval of state plans has been judicially sanctioned. However, there is an important point that distinguishes *Kentucky v. Train* from the case at bar. In *Kentucky v. Train*, EPA disapproved the state standards because they failed to meet the minimum requirements of the FWPCA. On the other hand, in the case at bar, plaintiff is asking this Court to declare invalid standards that are more stringent than those contained in the Act. Declaring state standards invalid because they are too stringent violates both the statute itself and case law interpreting the statute. Section 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C), allows states to adopt more stringent standards than those established by the Act. Furthermore, §§ 303(f) and 510 of the FWPCA, 33 U.S.C. §§ 1313(f) and 1370, give the states the power to establish any effluent limitation standards which are equal to or more stringent than the Act's standards.

In *United States Steel Corporation v. Train*, 556 F.2d 822 (7th Cir. 1977), the Court dealt with the issue of more stringent state standards. The Court held that the FWPCA was not designed to inhibit the states from adopting more stringent standards and in forcing industry to create more effective pollution control technology. *Id.* at 830. *See also Union Electric Company v. Environmental Protection Agency*, 427 U.S. 246, 265, 96 S.Ct. 2518, 2529, 49 L.Ed.2d 474 (1976), which deals with stricter state standards under the Clean Air Act.

Furthermore, the Court held that EPA has no authority to set aside or modify state standards which are more stringent than those mandated by the Act. *United States Steel, supra*, at 835. The Court stated:

It is clear from §§ 301 and 510 of the Act, and the legislative history, that the states are free to force technology. . . . Only the federal effluent limitations must be technology-based, and they represent the minimum level of pollution reduction required by the Act. . . . If the states wish to achieve better water quality, they may, even at the cost of economic and social dislocations caused by plant closings. *Id.* at 838. *See also The Environmental Protection Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 219, 96 S.Ct. 2022, 2031, 48 L.Ed.2d 578 (1976) and *State of Minnesota v. Hoffman*, 543 F.2d 1198, 1208 (8th Cir. 1976).

The FWPCA clearly indicates that the states are to play a significant role in the reduction of water pollution. Section 101(b), 33 U.S.C. § 1251(b) provides:

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use . . of land and water resources . . . .

*See also* § 402(b), 33 U.S.C. § 1342(b), which deals with the State's involvement in the administration of the FWPCA.

■■■ South Dakota's water quality standards simply establish more stringent standards than those required by the Act. The statute itself and the case law make it clear that the states can adopt more stringent standards and can force technology. Under §§ 301 and 510 of the FWPCA, EPA had no power to disapprove these standards and was required to include them in the NPDES permit. South Dakota was not required to consider economic and social factors and thus its failure to do so, does not invalidate its water quality standards. Even though it may be much more difficult for plaintiff to comply with South Dakota's standards than it would be to comply with the Act's standards, South Dakota had the power to adopt the stricter standards and EPA's approval of those standards was not arbitrary and capricious or violative of the Act.

## IMPLEMENTATION OF §§ 302 AND 303

The objective of the FWPCA is set out in § 101(a), 33 U.S.C. § 1251(a). This objective is generally referred to as the goal of achieving fishable/swimmable waters. It underlies the effluent limitations established by both the states and EPA.

Plaintiff argues that the fishable/swimmable goal is being improperly implemented. Plaintiff contends that § 302 of the FWPCA, 33 U.S.C. § 1312, was intended to be the primary means of implementing the fishable/swimmable goal, but instead, EPA has improperly relied on § 303, 33 U.S.C. § 1313, as the primary method of achieving this goal. Section 302 reads as follows:

(a) Whenever, in the judgment of the Administrator, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under section 1311(b)(2) of this title, would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limitations (including alternative effluent control strategies) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality.

(b)(1) Prior to establishment of any effluent limitation pursuant to subsection (a) of this section, the Administrator shall issue notice of intent to establish such limitation and within ninety days of such notice hold a public hearing to determine the relationship of the economic and social costs of achieving any such limitation

or limitations, including any economic or social dislocation in the affected community or communities, to the social and economic benefits to be obtained (including the attainment of the objective of this chapter) and to determine whether or not such effluent limitations can be implemented with available technology or other alternative control strategies.

(2) If a person affected by such limitation demonstrates at such hearing that (whether or not such technology or other alternative control strategies are available) there is no reasonable relationship between the economic and social costs and the benefits to be obtained (including attainment of the objective of this chapter), such limitation shall not become effective and the Administrator shall adjust such limitation as it applies to such person.

(c) The establishment of effluent limitations under this section shall not operate to delay the application of any effluent limitation established under section 1311 of this title.

■ Section 302 requires a cost-benefit hearing prior to the establishment of new effluent limitations where the effluent limitations required under § 301(b)(2), 33 U.S.C. § 1311(b)(2), are not sufficient to attain the goals of the FWPCA. Section 301(b)(2) requires the achievement of effluent limitations applying BAT by July 1, 1984. Therefore, as defendant EPA points out, it appears that plaintiff's claim is premature. Section 302 applies only when the application of BAT will interfere with the attainment of the fishable/swimmable goal. Because many of the standards based on BAT are not yet established, plaintiff presently is not being asked to comply with any effluent limitation stricter than BAT. (See decision of the General Counsel, attached to defendant EPA's brief as Exhibit D.) Thus, § 302 should not be applied at this time and plaintiff should not be allowed to complain about the lack of a hearing.

■ However, even if plaintiff's claim is not considered premature, the claim would still fail because the use of § 303 by EPA has not been improper.

Plaintiff supports its contention that § 302 was to be the primary means of achieving the fishable/swimmable goal by citing the comments of several senators who were involved in the passage of the FWPCA. Although the comments cited by plaintiff do indicate that § 302 was to be relied on, it must be noted that the cited comments were made about the original Senate bill, which did not contain § 303 or an equivalent. Therefore, under the Senate bill, § 302 was the only mechanism for establishing stricter effluent limitations. However, after a House-Senate conference committee finished dealing with the bill, § 303 was added. Therefore, the relevance of those comments which were merely concerned with the Senate bill must be questioned. Furthermore, the legislative history cited in defendant EPA's brief indicates the importance of § 303.

Section 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C) requires that there shall be achieved,

> not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) . .

This statute clearly deals with more stringent state limitations. Nowhere does it require that a § 302 hearing be held before the adoption of such a standard.

A decision by EPA's General Counsel, Robert Zener (attached to Defendant EPA's brief as Exhibit D) dealt with the question regarding the applicability of § 302. The question presented in that decision was whether state-established effluent limitations, which are more stringent than BAT, are subject to the hearing requirement of § 302. In that instance the permit holder argued that § 302 amends § 301(b)(1)(C) by requiring EPA to follow the provisions of § 302 before imposing effluent limitations based on water quality standards which are more stringent than BAT. In rejecting this

**1286**

argument, EPA's General Counsel held that there was no interconnection between § 301(b)(1)(C) and § 302. The opinion goes on to point out that under § 301(b)(1)(C) the effluent limitations are established by individual examination of the waterway and that the hearing under § 302 to consider costs and benefits is not necessary. Based upon this and other factors, EPA's General Counsel determined that EPA must apply the water quality standards without resort to a § 302 cost-benefit analysis. *See also State Water Control Board v. Train*, 559 F.2d 921 (4th Cir. 1977).

As pointed out in the first section of this opinion, the states clearly have the right to establish more stringent standards than those mandated by the FWPCA. If plaintiff's interpretation of the statute was correct, any time state standards exceeded BAT, a cost-benefit analysis would have to be conducted by EPA. This would have the effect of virtually emasculating the states' power, which is guaranteed by § 510. Section 302 guarantees a hearing only if the effluent limitations are adopted under EPA authority, not state authority. The rights of the states are clearly protected by the Act and states are intended to be an integral cog in the operation of the statute. Plaintiff's interpretation would have the effect of decreasing the states' power. This does not appear to be intended by § 302.

■ Plaintiff further alleges that EPA's implementation of § 303 has been arbitrary and capricious. Plaintiff complains that through the use of a guidance document (Record Outline at 149–190), EPA illegally limited the discretion of the states in adopting their water quality standards. The guidance document indicates that the states should give prime importance to recreational uses and the preservation of aquatic biota. (Record Outline at 155.) Plaintiff complains that EPA improperly imposed these standards on South Dakota, and in so doing, restricted South Dakota from exercising its full range of statutory authority because it prevented South Dakota from considering industrial, agricultural and other use classifications.

In support of this argument, plaintiff cites *Associated Industries of Alabama v. Train*, 543 F.2d 1159, 9 E.R.C. 1561 (N.D. Ala.1976). In that case, EPA disapproved Alabama's water quality standards because they did not meet EPA's "national policy" which prohibited use classification below that of "fish and wildlife." This so-called national policy was set in an EPA memorandum. EPA claimed that under § 303(a) it could declare Alabama's standards invalid because they were not consistent with the applicable requirements of the FWPCA. The plaintiffs claimed EPA's actions were arbitrary and capricious.

The Court found that Alabama's water quality standards were consistent with the Act and that EPA had disapproved them because they failed to meet the "fish and wildlife" criteria. The Court found that the states were permitted by the Act to consider other use classifications, such as agricultural and industrial uses, and could not be restricted to considering fish and wildlife as the minimum use classification. The Court concluded that EPA had not properly established a national policy and therefore Alabama was not compelled to comply with the requirements in the memorandum.

Plaintiff argues that through the use of the guidance document EPA has forced the states to do exactly what the Court in *Associated Industries, supra*, said EPA could not do; that being, requiring the states to adopt 1983 fishable/swimmable goal in 1977. One key factor distinguishes the *Associated Industries* case from the one at bar. In *Associated Industries*, EPA attempted to force the State of Alabama to adopt water quality standards which Alabama did not want to adopt. Such is not the case here.

■ Assuming arguendo that the memorandum involved in *Associated Industries* and the guidance document at issue in this case are both examples of a wrongful attempt to impose water quality standards contrary to the FWPCA, the fact is that the State of South Dakota is not complaining in this case. As is shown in the first section of

this opinion, the states have the right to force technology and establish stricter water quality standards. *United States Steel Corp. v. Train, supra.* In this case, South Dakota is not complaining, as did Alabama in *Associated Industries*, that EPA is forcing it to adopt water quality standards it did not wish to adopt. South Dakota used its considerable discretion under the FWPCA and adopted the standards it felt would best serve the state. That being the case, plaintiff is in no position to complain about the standards. If South Dakota felt EPA was attempting to force it to adopt standards it did not want, it could do as Alabama did in *Associated Industries* and refuse to adopt such standards or challenge EPA in court. However, since this has not been done, it must be assumed that the water quality standards adopted for Whitewood Creek were those desired by the state and was within the State's power under the FWPCA.

## APPROVAL OF THE CHEYENNE RIVER BASIN PLAN

Plaintiff next challenges EPA's approval of the § 303(e), 33 U.S.C. § 1313(e), Cheyenne River Basin Plan. (*See* Record Outline at pages 30–163.) A large part of western South Dakota, including Whitewood Creek, is included in the Cheyenne River Basin. The Plan establishes South Dakota's

> strategy for correcting water pollution and thereby improving and maintaining water quality in the Cheyenne River Basin. . . . It specifies the process of planning and managing pollution abatement operations to achieve South Dakota's standards for pollutant discharges to, and water quality in the Basin's, lakes, rivers and tributaries. Record Outline at page 37.

This plan was implemented pursuant to § 303(e) of the FWPCA.

Section 303(e) provides for the establishment, by the states, of a continuing planning process. Section 303(e)(3)(C) 33 U.S.C. § 1313(e)(3)(C), reads as follows:

The Administrator shall approve any continuing planning process submitted to him under this section which will result in plans for all navigable waters within such State, which include, but are not limited to, the following: . . .

> (C) total maximum daily load for pollutants in accordance with subsection (d) of this section.

The method of establishing the daily load is set out in § 303(d)(1), 33 U.S.C. § 1313(d)(1). That section provides:

> (A) Each State shall identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters. . .

> (C) Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

Section 304(a)(2)(D) of the FWPCA, 33 U.S.C. § 1314(a)(2)(D), requires EPA to identify pollutants which are suitable for maximum daily load calculations by October 18, 1973. Prior to the adoption of South Dakota's water quality standards defendants failed to comply with these sections of the Act in that maximum daily loads for pollutants were not established.

These procedures were meant to assist EPA and the states in implementing the requirements of the Act. Plaintiff con-

tends that these procedures are mandatory requirements of the FWPCA. Furthermore, plaintiff argues that the failure to comply with these procedures should invalidate the entire Cheyenne River Basin Plan.

■ Although South Dakota did not establish total maximum daily loads as required by § 303(d), this was not required of the state until 180 days after EPA's identification of pollutants. Section 304(d)(2), 33 U.S.C. § 1314(d)(2). Because EPA had not identified the pollutants at the time of the Basin Plan's adoption, South Dakota cannot be said to have failed to comply with this portion of the FWPCA. The question then becomes whether EPA's failure to identify pollutants suitable for maximum daily load calculations pursuant to § 304(a)(2)(D) is of such magnitude as to invalidate the Cheyenne River Basin Plan and in turn, to invalidate plaintiff's NPDES permit.

It appears to this Court that EPA's failure to identify pollutants does not invalidate the Basin Plan. First of all, plaintiff's attack on the entire Basin Plan is clearly an attempt to avoid having to comply with the terms of its NPDES permit. Section 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F) provides that a challenge to an NPDES permit can be made within 90 days of the permit's issuance in the applicable Circuit Court of Appeals. This, plaintiff did not do. Furthermore, plaintiff withdrew its request for an adjudicatory hearing regarding its permit under 40 C.F.R. § 125.36(b). (See Exhibit A attached to EPA's brief.) Since plaintiff neglected its other opportunities to challenge its NPDES permit, the Court is unwilling to invalidate the entire Cheyenne River Basin Plan because of plaintiff's dissatisfaction with its permit.

Furthermore, it appears that § 402(a)(1) of the FWPCA, 33 U.S.C. § 1342(a)(1), allows the issuance of a permit prior to the taking of all implementing actions. This statute provides in part as follows:

> [T]he Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, . . . prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

It appears to this Court that Congress anticipated that some of the Act's requirements would not, or could not, be complied with prior to the issuance of permits. Therefore, § 402 was included in the Act to insure that the permit issuance program was not stymied because another part of the Act had not been strictly complied with.

The case of *E. I. duPont deNemours & Company v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), indicates the flexibility given to EPA by the Act. In that case, the plaintiff attacked EPA's failure to adopt certain guideline regulations. Although EPA was not in strict compliance with the Act, the Supreme Court did not invalidate the effluent limitations established by EPA. The Court quoted from *Train v. Natural Resources Defense Counsel,* 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731.

> We therefore conclude that the Agency's interpretation . . . was 'correct,' to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this one is the 'correct' one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency. *Id.* at 134, 97 S.Ct. at 978.

The FWPCA is a complex statute. EPA clearly has more experience working with it than do most other public or private entities. In implementing and interpreting such a complex statute, EPA's interpretation must be given a great deal of weight. In approving South Dakota's Cheyenne River Basin Plan, EPA substantially complied

with the Act's requirements.[2]  Furthermore, plaintiff's right to challenge the effluent limitation and its NPDES permit was preserved.  Therefore, this Court sees no reason to declare the Basin Plan invalid or to find EPA's approval of it to be arbitrary and capricious.

## CONCLUSION

The establishment of South Dakota's water quality standards and EPA's approval of them appear to this Court to be in compliance with the FWPCA.  Therefore, the summary judgment motion of the defendants will be granted and plaintiff's motion for summary judgment will be denied.

Richard S. Walinski, Chief Counsel, Columbus, Ohio, for George F. Denton.

Cary Rodman Cooper, Toledo, Ohio, Sp. Counsel, for E. P. Perini.

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

---

2.  EPA's failure to identify pollutants by October 18, 1973, as required by § 304(a)(2)(D) does not appear to have damaged the plaintiff.